IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT NASHVILLE

MARCH SESSION, 1998

FILED

October 12, 1998

Cecil W. Crowson
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | C.C.A. NO. 01C01-9706-CR-00223 |
| | ) | |
| Appellee, | ) | |
| | ) | |
| | ) | DAVIDSON COUNTY |
| VS. | ) | |
| | ) | HON. SETH NORMAN |
| RACHEL MARIE GREEN, | ) | JUDGE |
| | ) | |
| Appellant. | ) | (Facilitation of Second Degree Murder; |
| | ) | Facilitation of Attempted Second Degree |
| | ) | Murder) |

ON APPEAL FROM THE JUDGMENT OF THE
CRIMINAL COURT OF DAVIDSON COUNTY

FOR THE APPELLANT:

JEFFREY A. DeVASHER (on appeal)
Assistant Public Defender

WENDY S. TUCKER (at trial)
Assistant Public Defender

KARL F. DEAN (at trial)
Metro Public Defender

1202 Stahlman Building
Nashville, TN 37201

FOR THE APPELLEE:

JOHN KNOX WALKUP
Attorney General & Reporter

KATHY MORANTE
Assistant Attorney General
425 5th Avenue North
Nashville, TN 37243

VICTOR S. JOHNSON
District Attorney General

STEVE DOZIER
Assistant District Attorney General
Washington Square, Suite 500
222-2nd Avenue North
Nashville, TN 37201-1649

OPINION FILED _____

REVERSED; CONVICTIONS VACATED

DAVID H. WELLES, JUDGE

# OPINION

The Defendant, Rachel Marie Green, appeals as of right pursuant to Rule 3 of the Tennessee Rules of Appellate Procedure. She was convicted by a Davidson County jury of facilitation of second degree murder and facilitation of attempted second degree murder.[1] The trial court sentenced her as a Range I standard offender to concurrent terms of ten years imprisonment for facilitation of second degree murder and five years imprisonment for facilitation of attempted second degree murder. In this appeal, the Defendant raises the following seven issues for our consideration:

> (1) that the trial court erred in denying the motion to suppress her statement to police;
> (2) that the trial court erred in effectively denying her motion for a bill of particulars;
> (3) that the evidence was legally insufficient to support the verdicts;
> (4) that the trial court erred in denying her request for a jury instruction on the defense of necessity;
> (5) that the trial court erred in reassembling the jury to report guilty verdicts after the jury had initially reported verdicts of not guilty;
> (6) that the trial court erred in denying her motion for a mistrial due to the manner in which the verdicts were received; and
> (7) that the trial court erred in charging the jury with respect to release eligibility pursuant to Tennessee Code Annotated § 40-35-201(b)(2).

After reviewing the record and the thorough briefs submitted by both the Defendant and the State, we conclude the "not guilty" verdict as announced by the jury could not later be altered after discharge of the jury and after its separation from the trial court to such a degree that outside contacts may have been had. Although it is unfortunate that this result may have been contrary to the apparent intentions of the jury, our law unquestionably disallows an alteration of the verdict under the unique circumstances of this case. Although no other

---

[1] Tenn. Code Ann. §§ 39-11-403, 39-13-210, 39-12-101.

issues raised by the Defendant have merit, we must reverse the judgment of the trial court and vacate the convictions.

We begin with a brief summary of the pertinent facts. On the morning of May 17, 1996, Detective Tim Mason received a telephone call from an individual with information concerning the whereabouts of two people allegedly wanted by the police. Those two people, Jeffrey Swafford and the Defendant, were said to be located at the River Retreat Apartments in Nashville. According to the individual placing the telephone call, Swafford and the Defendant were packing and preparing to leave town. After the telephone call, Detective Mason verified that Swafford and the Defendant had outstanding warrants by running a computer check. He then asked Detective David Miller to accompany him to the River Retreat Apartments to serve the warrants. They arrived at the apartment complex at approximately 9:00 that morning.

Upon arrival, they noticed that Officer Paul Scurry was already at the scene. They spoke briefly with members of the management of the apartment complex, who assured the officers that the unit leased by the Defendant was occupied at that time. The officers then knocked on the door to the Defendant's apartment. After receiving no answer to their knocks, they obtained keys to the apartment from the complex management. Officer Scurry attempted to unlock the door, but the officers were unable to open it. At this point, Scotty Brandon, the maintenance supervisor for the complex, began kicking the door in an attempt to enter the apartment. Shortly after Brandon began kicking the door, they heard a female voice — the Defendant's — call out from inside the apartment, "Who is

it?" By this time, approximately two to three minutes had passed since Officer Scurry first knocked on the door.

In response to the Defendant's question, Officer Scurry informed her that he was a police officer. The Defendant called out asking to know what he wanted. Officer Scurry then informed her that he had arrest warrants for both her and Jeffrey Swafford. The Defendant responded that she was in bed and needed to get dressed. Officer Scurry told her to do so quickly. Approximately two to three more minutes passed, at which point the officers again began to kick the door to the apartment. During the two to three minute wait, Kim Garner, the occupant of the apartment adjacent to the Defendant's, heard shuffling noises coming from the Defendant's bedroom, as if things were being moved. Shortly thereafter, the Defendant removed a chair which was propped underneath the door handle and opened the door to the apartment. She was taken into custody, handcuffed, and seated in a chair in the living room of the apartment while the officers checked the remaining rooms for Swafford.

During this time, Detective Mason asked the Defendant if Swafford was there, accidentally referring to him as "Jimmy" rather than "Jeffrey." The Defendant responded that she did not know "Jimmy Swafford." Detective Mason corrected himself, but the Defendant maintained that there was no one else in the apartment. The officers soon discovered an attic access in the ceiling of a bedroom closet. A shelf in the closet was broken and there was insulation on the clothing, leading the officers to suspect that someone had climbed into the attic recently. The ceiling was eight feet tall and there was nothing in the immediate area to use to gain access to the attic. As a result, the officers asked the

-4-

maintenance workers from the apartment complex to bring them a ladder. Detective Mason continued his conversation with the Defendant, telling her, "that we felt like [Swafford] was up there; that we didn't want anybody hurt; if he had any weapons, she needed to tell us; that we didn't want him hurt; we didn't want her hurt; we didn't want us hurt." The Defendant appeared calm and simply continued to deny that anyone else was present in the apartment.

At this point, Detective Miller exited the apartment and circled around to the other side of the building in case Swafford attempted to escape through another apartment. Officer Joe Brogdon replaced Detective Miller at the closet, waiting with Officer Scurry for the ladder. Once they had the ladder, Officer Scurry called up into the attic for anyone up there to come down. He received no response. Officer Scurry climbed into the attic and soon called down to Officer Brogdon that he had located Swafford. Officer Brogdon then climbed into the attic. He observed Swafford, ten to twelve feet away from the officers. Swafford spoke to the officers in what Brogdon described as a "jerk voice," repeatedly telling them to "shoot me in the head, shoot me in the chest." Officer Brogdon did not have his weapon drawn but could not tell if Officer Scurry had his weapon drawn. Scurry was talking to Swafford, ordering him to show his hands and to come forward. Brogdon looked down to adjust his footing on the beams in the attic, at which time gunfire erupted. Brogdon was hit by a gunshot and fell back through the attic access.

Once the gunfire erupted, Detective Mason led the Defendant outside the apartment, where they took refuge behind a car. Detective Miller soon circled around from the other side of the building and joined them behind the car. Officer

Brogdon emerged from the apartment, helped by Scotty Brandon, the complex maintenance supervisor. Detective Miller asked the Defendant how many guns Swafford had. She replied that he had two handguns, a .380 and a 9 millimeter. She was then secured in a patrol car and transported to police headquarters. During her transport, the Defendant quietly sat in the back of the patrol car and did not appear to be upset.

After the departure of the Defendant, numerous officers arrived on the scene. Officers entered the apartment on several occasions in an attempt to rescue Officer Scurry, but were turned back by gunfire. They were eventually able to confront Swafford in a bedroom of the apartment. Swafford was shot and killed during the confrontation. Officers then located Scurry in the attic. Scurry had no pulse and was not breathing. They attempted to revive Scurry but were unsuccessful. Scurry was later pronounced dead, having suffered seven gunshot wounds.

At trial, the State also offered the testimony of Casey Lawson, an acquaintance of the Defendant. Lawson was the individual who called Detective Mason on the morning of the shooting to inform him of the whereabouts of Swafford and the Defendant. Prior to his conversation with police, Lawson spoke with the Defendant on numerous occasions. According to Lawson, the Defendant had stated that "she just wasn't going easy" if the police attempted to serve the outstanding warrants on her.

The State also offered proof concerning an incident which occurred on May 16, 1996, the day before the shooting at the Defendant's apartment. On May 16,

Officer John Nicholson attempted to serve outstanding warrants on the Defendant and Swafford at a Sonic restaurant. Officer Nicholson approached a car at the restaurant. Swafford was in the driver's seat and the Defendant was in the passenger's seat. Upon questioning, Swafford gave Nicholson a false name. Nicholson eventually frisked Swafford and found marijuana. As a result, Nicholson ordered Swafford back to the patrol car. Swafford, however, fled the scene with Nicholson in pursuit. Swafford escaped after a short chase, and Nicholson returned to the scene of the attempted arrest. As he returned, he observed the Defendant fleeing by car, driving over a concrete island in the process.

Finally, the State offered a statement made by the Defendant to police after the shooting. As the shooting began, the Defendant was transported to police headquarters. Once there, she was interviewed by Detective Kent McAlister. During the interview, the Defendant spoke briefly about the May 16 Sonic incident. She recounted essentially the same events as Officer Nicholson. In explaining why she fled the scene, she stated that she was not supposed to be with Swafford because of an order of protection she had previously secured against him. She did admit, however, that approximately one hour after she fled the Sonic, she beeped Swafford and thereafter picked him up not far from the scene.

In her statement, the Defendant also recounted essentially the same course of events leading up to the eruption of gunfire at her apartment as testified to by the police officers on the scene. She awoke on the morning of May 17 to the sound of someone attempting to kick in her door. She asked who was there

and was informed that it was the police. She asked them to wait while she dressed herself. During this time, she told Swafford to hide in the attic and stated that she would tell the police that he was not there. The Defendant made this decision because Swafford had previously told her "that if they [the police] come in on him like that again that he would shoot." She then opened the door and was taken into custody by the police. They asked her if "Jimmy" was there, and she replied that she did not know "Jimmy." Upon further questioning, she told the officers that no one else was in the apartment. She admitted that she did not inform the officers of the possibility that Swafford was armed or of his prior statements of what he would do if confronted by police officers attempting to arrest him. She maintained, however, that she was never asked those questions directly. Once the gunfire erupted, she was escorted out of the apartment and transported to police headquarters.

At the close of the State's case-in-chief, the Defendant offered proof in her defense. The principal proof offered was her own testimony. The Defendant, twenty-one years old at the time of trial, began a relationship with Swafford in 1994. She had known him for some time prior to beginning the relationship. In 1995, the relationship became violent, beginning with verbal abuse and escalating to physical abuse. According to the Defendant, Swafford at times grabbed her hair, grabbed her throat, threw her to the floor, struck her face, and hit her with a handgun; and he even raped her in October of 1995. The Defendant's mother learned of the abuse and called the police. The Defendant initially refused to press charges because she was scared of Swafford. In January of 1996, however, she obtained an order of protection and a warrant for Swafford's arrest based on telephone harassment. She informed the police of

Swafford's whereabouts so that they could serve the warrant. At that time, she told the police that Swafford might have weapons, that he was violent, and that he would not be easy to arrest.

A short time after Swafford's arrest, the Defendant discovered he was out of prison. She called the prison authorities, but they maintained that Swafford was still incarcerated. Swafford eventually drove by the Defendant's mother's home and threatened to kill them all. The Defendant called authorities in an attempt to have the order of protection enforced, but they maintained that Swafford was still in prison. The threats prompted the Defendant, in March of 1996, to move into River Retreat Apartments with a longtime friend, Amy Tayse. The Defendant hoped to evade Swafford by moving.

In spite of the move, Swafford located the Defendant and began attempts to contact her, eventually showing up at her front door. At that point, the Defendant "tolerated" Swafford. The Defendant testified that Swafford "was the type of person that you just couldn't get rid of. He wouldn't — if he had his mind made up, there wasn't much you could do." She admitted that she still had feelings for Swafford but that their relationship was far from normal. She described their relationship at this point as "[a] lot of drugs, a lot of guns." Swafford was frequently under the influence of narcotics and often spoke of how he would kill the Defendant and then kill himself.

She described the May 16 Sonic incident in much the same way as Officer Nicholson. After Swafford fled from Officer Nicholson, the Defendant moved into the driver's seat and drove away from the scene. According to the Defendant,

she fled the scene because she "didn't want to have any part of having [Swafford] go back to jail." After his release from jail in early 1996, Swafford had threatened that if the Defendant ever had him sent back to jail, he would kill her.

With regard to her actions on the day of the shooting at her apartment, the Defendant admitted that she told the police that no one else was present in her apartment. The Defendant testified that she did so out of fear of Swafford. According to the Defendant, when the police knocked on her door, Swafford held a gun to her head and threatened to kill her if she revealed that he was there. She told Swafford to hide in the attic. She assured him she would not tell the police that he was there. She then went to the living room and told the police that she needed to put on clothes. When she returned to the bedroom, Swafford was already most of the way into the attic. She did not know how he had been able to get into the attic, nor did she see him carrying a gun into the attic. She returned to the living room and opened the front door, at which time she was taken into custody. In response to questioning, she told the police officers that there was no one else in the apartment because, even though she was surrounded by police officers, she still feared Swafford and the threats he had made against her. Once gunfire erupted, she was escorted out of the apartment and transported to police headquarters where she made a statement. During the statement, she did not mention the recent threats made against her by Swafford because she was afraid of him and what he might do to her if he thought she was responsible for his capture.

On cross examination, the Defendant admitted Swafford had told her that he would shoot if police officers attempted to arrest him. She also admitted that

she believed Swafford was "crazy" enough to do so. Although she maintained that she did not actually see Swafford take a gun into the attic, she testified that she knew it was probable that he had.

To corroborate her testimony about the abusive nature of her relationship with Swafford, the Defendant offered the testimony of Officer Steve Ray, Detective Mike McCarty, and Amy Tayse. Officer Ray testified that he learned of an allegation of abuse from the Defendant's mother in October of 1995. He met with the Defendant and her mother at the Defendant's mother's home. Ray stated that most of the information concerning the abuse came from the Defendant's mother, while the Defendant said only that Swafford had not hit her hard. Officer Ray testified that the Defendant did not want to prosecute Swafford. Detective Mike McCarty testified that he spoke with the Defendant on January 23, 1996, about abuse perpetrated by Swafford. As a result of this conversation, the Defendant obtained an order of protection and a warrant against Swafford for telephone harassment. The Defendant assisted in the arrest of Swafford by revealing his location, and she warned the officers that Swafford might be armed. Both Officer Ray and Detective McCarty testified that the Defendant made no allegation that Swafford had ever raped her.

Amy Tayse, a longtime friend of the Defendant, corroborated the Defendant's testimony concerning how Swafford contacted the Defendant following his release from the January 1996 arrest. Tayse and the Defendant moved into the River Retreat Apartments together in March of 1996. They attempted to avoid Swafford but to no avail. Swafford began to come to their apartment more often, prompting Tayse to move out two weeks before the

shooting. Tayse testified that she did not like Swafford's attitude and did not like the Defendant's attitude when she was around Swafford.

Tayse also testified concerning an incident that occurred in the autumn of 1995. She recounted being called by the Defendant to a party at Swafford's sister's home. Once there, they told Swafford that they were going to leave, but Swafford refused to allow the Defendant to do so. Swafford threw the Defendant down on a bed in the home and Tayse left the room. She could hear the Defendant screaming after she left. Swafford emerged from the room thirty to forty-five minutes later with a smirk on his face. When Tayse entered the room, the Defendant was flushed and had on no shirt. The buttons of the shirt she had previously been wearing had been torn off.

The Defendant was indicted for facilitation of the first degree murder of Officer Scurry and for facilitation of the attempted first degree murder of Officer Brogdon. She was tried from March 10 to March 14, 1997. After considering the proof presented at trial, the jury initially reported not guilty verdicts on both counts, but was later reassembled and found the Defendant guilty of the lesser offenses of facilitation of second degree murder and facilitation of attempted second degree murder. She now appeals to this Court.

In her first issue on appeal, the Defendant argues that the trial court erred in denying the motion to suppress her statement to police. The Defendant's argument focuses on the failure of Detective McAlister to inform her of the crimes she was suspected of having committed. She contends that her lack of knowledge of the suspected crimes rendered her Miranda waiver involuntary.

Thus, she argues that her statement was admitted at trial in violation of her right against self-incrimination and her right to counsel. See U.S. Const. amend. V; U.S. Const. amend. VI; Tenn. Const. art. I, § 9.

Prior to trial, the Defendant filed a motion to suppress her statement. The trial court conducted a hearing on the motion to suppress on December 18, 1996. The only witness to testify at that hearing was Detective McAlister. McAlister testified that he responded to the scene of the shooting between 10:00 and 10:30 a.m. He received the assignment of taking an apartment maintenance worker to police headquarters for an interview. After that interview, he interviewed the Defendant. Prior to interviewing the Defendant, McAlister's knowledge of the shooting incident consisted only of knowing that officers had attempted to serve warrants at the scene, gunshots had been exchanged, and one officer had been taken to the hospital. McAlister was told to interview the Defendant, that she was in the apartment when the gunfire erupted, and that she had outstanding warrants. McAlister requested the Defendant to execute a Miranda waiver form because she was under arrest on the outstanding warrants. The Defendant signed the Miranda waiver form and proceeded to give the statement which was subsequently introduced at her trial. At no time did Detective McAlister inform the Defendant that she was suspected of facilitating Swafford's shooting of Officers Scurry and Brogdon. In fact, it appears that Detective McAlister, given his limited knowledge of what had transpired at the Defendant's apartment, was actually unaware of the Defendant's precise relationship to the shooting. McAlister did testify that an investigator with the District Attorney General's office was present during the interview and had more information about the shooting than he did. The extent of this investigator's knowledge of the shooting, however, is unknown.

-13-

After the hearing on the motion to suppress, the trial court denied the motion. In so doing, the trial court found that Detective McAlister clearly informed the Defendant that he intended to ask her about the shooting incident which had occurred at her apartment that morning. Only after informing her of this purpose did he have the Defendant execute the Miranda waiver. The trial court further found that the videotape of the interview did not reveal any indication of coercion on the part of Detective McAlister. Accordingly, the trial court concluded that the Defendant's Miranda waiver was voluntary and denied the motion to suppress her statement.

In order to be valid, a waiver of Miranda rights must be voluntarily, knowingly, and intelligently made. Miranda v. Arizona, 384 U.S. 436, 479, 86 S. Ct. 1602, 1630, 16 L. Ed. 2d 694 (1966); State v. Van Tran, 864 S.W.2d 465, 472 (Tenn. 1993), cert. denied, 511 U.S. 1046, 114 S. Ct. 1577, 128 L. Ed. 2d 220 (1994). The issue of voluntariness of the waiver must be decided based on the totality of the circumstances surrounding each particular case. Van Tran, 864 S.W.2d at 472-73; State v. Benton, 759 S.W.2d 427, 431-32 (Tenn. Crim. App. 1988). The findings of fact of the trial court on issues concerning the making of a custodial statement are binding upon appellate review if there is any evidence in the record to support them. Van Tran, 864 S.W.2d at 473 (citing State v. O'Guinn, 709 S.W.2d 561, 566 (Tenn. 1986), and State v. Chandler, 547 S.W.2d 918, 923 (Tenn. 1977)).

In the present case, the Defendant argues that the failure of Detective McAlister to tell the Defendant what offenses she was suspected of having committed rendered her Miranda waiver involuntary. In so arguing, the

Defendant relies principally on a federal district court case from Montana, Schenk v. Ellsworth, 293 F. Supp. 26 (D. Mont. 1968). In Schenk, the court held that because the defendant was not advised the reason for his detention and questioning, waiver of his right to counsel was not knowing and intelligent. Schenk, 293 F. Supp. at 29. The court continued stating that "when a person is in custody and, for all practical purposes, charged with a crime, . . . then he must be told of the crime he is suspected of having committed before a statement can be taken." Id. (citation omitted). The court noted that "it stands to reason that a suspect cannot intelligently make the decision as to whether he wants counsel if knowledge of the crime suspected is withheld from him." Id. In support of her reliance on Schenk, the Defendant also points out that this Court has recognized that "a prisoner's ignorance of the charge against him might conceivably be a circumstance worthy of consideration with respect to the 'totality of circumstances.'" State v. Stearns, 620 S.W.2d 92, 95 (Tenn. Crim. App. 1981).

In considering the Defendant's argument, we first note that this Court is not bound by the Montana federal district court's holding with regard to the voluntariness of Miranda waivers. Instead, we are required to follow only the applicable constitutional rulings of the United States Supreme Court. See State v. McKay, 680 S.W.2d 447, 450 (Tenn. 1984), cert. denied, 470 U.S. 1034, 105 S. Ct. 1412, 84 L. Ed. 2d 795 (1985); State v. Bowers, 673 S.W.2d 887, 889 (Tenn. Crim. App. 1984).

We believe the decision of the United States Supreme Court in Colorado v. Spring, 479 U.S. 564, 107 S. Ct. 851 (1987), is controlling on this issue. In Spring, the Court held that the failure of law enforcement officials to inform a

suspect of all the possible subjects of interrogation is not relevant to determining whether the suspect voluntarily, knowingly, and intelligently waived his or her Fifth Amendment privilege.

Furthermore, we believe that Tennessee case law is in accord with Spring. In State v. Stearns, 620 S.W.2d 92 (Tenn. Crim. App. 1981), a case cited by the Defendant in support of her argument, this Court stated that "[t]hough a prisoner's ignorance of the charge against him might conceivably be a circumstance worthy of consideration with respect to the 'totality of circumstances,' Miranda v. Arizona does not require the interrogating officers to advise a defendant of the nature of the crime under investigation." 620 S.W.2d 92, 95 (citations omitted).

Applying these principles to the case sub judice, we conclude that the trial court did not err in admitting the Defendant's statement. It is clear from the record that Detective McAlister did not tell the Defendant that she was or would be charged with the criminal offenses of facilitating the murder of Officer Scurry and facilitating the attempted murder of Officer Brogdon. From our review of the videotape of the interview, however, it is equally clear that McAlister did inform the Defendant that he wanted to speak with her about the incident which had occurred at her apartment earlier that morning. Thus, when the Defendant executed the Miranda waiver, she was aware of the subject of the questioning. After telling the Defendant the subject of the questioning, McAlister verbally advised her of her constitutional rights, the Defendant herself read the form advising her of those rights, and she signed the form waiving those rights. The record indicates that the Defendant was literate, had graduated from high school, and appeared coherent during questioning. Finally, there is no evidence in the

-16-

record of any threat or coercion on the part of Detective McAlister. In that regard, the Defendant contends that McAlister implied she would be held indefinitely if she did not submit to questioning. In particular, the Defendant points to McAlister's response to her question about what would happen if she did not wish to make a statement. McAlister responded by making reference to her outstanding warrants.

From our review of the record, however, we do not believe that Detective McAlister's response was threatening or coercive. The response must be considered in the context of the conversation at that point. As McAlister was informing the Defendant of her constitutional rights, the following colloquy occurred:

> Q.    With that right [against self-incrimination] in mind, do you wish to waive that right and answer questions now?
> A.    I guess.
> Q.    Well, it has either got to be a yes or a no, it can't be an I guess.
> A.    And if I don't, what?
> Q.    If you don't, then we can't interview you and talk to you.
> A.    And what are they going to do, just hold me?
> Q.    I understand you have some outstanding warrants for something, don't you?

Considering the entire colloquy, we do not believe that McAlister's comments were threatening or coercive so as to suggest that the Defendant's Miranda waiver was involuntary. Rather, we believe McAlister's reference to the Defendant's outstanding warrants was merely a simple response to the Defendant's question of whether she would be held in custody if she did not wish to make a statement. It is clear that immediately prior to the reference to outstanding warrants, McAlister told the Defendant that if she did not wish to make a statement, he could not question her. The videotape of the interview

reveals no indication of a threatening or coercive mannerism on the part of Detective McAlister, nor does it show a reaction on the part of the Defendant indicating that she felt threatened or coerced. We simply cannot conclude that McAlister's reference to the Defendant's outstanding warrants constituted a threat or an attempt to coerce the Defendant into submitting to questioning.

Accordingly, after considering the totality of the circumstances, we believe the record supports the trial court's findings that the Defendant was aware of the subject of the questioning prior to executing the Miranda waiver, that she was advised of her constitutional rights, and that she waived those rights without any threat or coercion. We therefore conclude that the State demonstrated the Defendant's Miranda waiver and subsequent statement were voluntary and, thus, the trial court did not err in denying the motion to suppress. The Defendant's first issue is without merit.

In her second issue on appeal, the Defendant argues that the trial court erred by effectively denying her motion for a bill of particulars. In order to address this issue, we first examine the procedural history relating to the Defendant's request for a bill of particulars. On September 30, 1996, the Defendant filed a motion for a bill of particulars pursuant to Rule 7(c) of the Tennessee Rules of Criminal Procedure. The motion requested the State to furnish information regarding the time of the offenses and the manner in which the Defendant was alleged to have facilitated the murder and attempted murder. In other words, the Defendant sought to require the State to reveal which of her actions constituted the "substantial assistance" necessary to prove the offense

-18-

of facilitation.[2]  On January 6, 1997, the State filed a response to the motion for a bill of particulars.  With regard to the request for information concerning the time of the offenses, the State referred the Defendant to its prior response to a discovery request.  With regard to the request for information concerning the manner in which the Defendant was alleged to have facilitated, the State responded that the Defendant's request was not proper because the function of a bill of particulars is to apprise the Defendant of the offense charged, not provide a means for broad discovery of the State's theory of the case.  On January 18, 1997, the Defendant filed a motion to compel a response to this latter request contending that the State's response was inadequate.  After conducting a hearing, the trial court denied the motion to compel.  The Defendant now argues that the trial court effectively denied her motion for a bill of particulars, thereby depriving her of a fair trial in violation of the Fifth and Fourteenth Amendments to the United States Constitution and Article One, Sections Eight and Nine of the Tennessee Constitution.

Rule 7 of the Tennessee Rules of Criminal Procedure provides that "[u]pon motion of the defendant the court may direct the filing of a bill of particulars so as to adequately identify the offense charged."  Tenn. R. Crim. P. 7(c).  The purposes of a bill of particulars are to provide the defendant with information about the details of the charge if this is necessary to the preparation of the defense, to avoid prejudicial surprise at trial, and to enable the defendant to preserve a claim of double jeopardy.  State v. Byrd, 820 S.W.2d 739, 741 (Tenn.

---

[2]  Criminal responsibility for the offense of facilitation of a felony lies where a person, knowing that another individual intends to commit a specific felony but lacking the intent required for criminal responsibility for the conduct of that individual under Tennessee Code Annotated § 39-11-402(2), knowingly furnishes substantial assistance in the commission of the felony.  Tenn. Code Ann. § 39-11-403(a).

1991). The Advisory Commission Comments to Rule 7(c) make it clear that the bill of particulars provision should be construed to provide the defendant with knowledge of what he or she is charged with, not to provide broad discovery. See also State v. Stephenson, 878 S.W.2d 530, 539 (Tenn. 1994). The test in passing on a motion for a bill of particulars is whether it is necessary that the defendant have the information sought in order to prepare his defense and to avoid prejudicial surprise. Id. at 539. A defendant should be provided enough information about the events charged so that he or she may, with diligence, adequately prepare for trial. Id.

In support of her argument, the Defendant emphasizes that although the bill of particulars is not intended as a means of broad discovery of the State's evidence and theories of the case, "to the extent that information is needed for the proper purposes of the bill, it will be required even if the effect is disclosure of evidence or of theories." State v. Hicks, 666 S.W.2d 54, 56 (Tenn. 1984). While we agree with this principle, we believe that it still begs the question of whether the information in a particular case is needed for the proper purposes of the bill. In other words, the central question remains whether it is necessary that the defendant have the information sought in order to prepare the defense and to avoid prejudicial surprise. See Stephenson, 878 S.W.2d at 539.

Applying these principles to the case at bar, we can only conclude that the trial court did not err in denying the Defendant's motion to compel. From our review, the record contains nothing to indicate that the Defendant was unable to prepare her defense or was unfairly surprised by the State's evidence at trial. The State's theory with regard to the actions constituting "substantial assistance"

focused on the Defendant's delaying of police entry into the apartment, directing Swafford to hide in the attic, lying to police about the presence of Swafford in the apartment, concealing the distinct possibility that he possessed weapons, and circumstantial evidence that she helped Swafford gain access to the attic and attempted to conceal that he had done so. We believe that even with the denial of the motion to compel, the Defendant was fully able to mount a defense against this theory and did, in fact, do so. She readily admitted that she delayed the entry of the police into the apartment, told Swafford to hide in the attic, and then lied to police about Swafford's presence in the apartment. The Defendant, however, offered as explanation of why she had done so the abusive, threatening nature of her relationship with Swafford. Similarly, she offered an explanation of why she had not informed police that Swafford might possess weapons. With regard to how Swafford gained access to the attic, the Defendant contradicted the State's circumstantial evidence by directly denying that she had any part in helping Swafford into the attic and offering an explanation of how he might have gained access by himself.

From this record, it does not appear that the Defendant was unprepared to refute the State's evidence by virtue of the denial of her motion to compel. Given the manner in which events transpired on the morning of the shooting, any defense proof would necessarily derive primarily from the Defendant's own testimony. At trial, the Defendant was indeed able to attack the State's theory through her own testimony, with additional third-person corroboration of her testimony about the nature of her relationship with Swafford. Although the jury chose not to accredit her testimony, we do not believe that she was unprepared to present a defense or unfairly surprised by the State's evidence. In fact, the

thoroughness of her rebuttal of many aspects of the State's theory indicates that the Defendant was fully prepared for trial.

We therefore conclude that it was not necessary that the Defendant have information concerning which actions the State alleged to have constituted "substantial assistance" in order to prepare her defense and to avoid prejudicial surprise. Thus, the trial court did not err in denying the Defendant's motion to compel additional information in the State's bill of particulars response. The Defendant's second issue is without merit.

In her third issue on appeal, the Defendant argues that the evidence was legally insufficient to support her convictions. She contends that the evidence failed to establish that she knowingly furnished substantial assistance to Swafford in his commission of second degree murder and attempted second degree murder. The thrust of the Defendant's argument is that her conduct did not assist Swafford because the police officers, in spite of what the Defendant said, suspected that Swafford was in the apartment. She claims that there is no indication that the police officers would have acted differently or that events would have transpired differently had her conduct been different.

When an accused challenges the sufficiency of the convicting evidence, the standard is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). Questions concerning the credibility of the witnesses, the

weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, not this court. <u>State v. Pappas,</u>

754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). Nor may this court reweigh or reevaluate the evidence. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).

A jury verdict approved by the trial judge accredits the State's witnesses and resolves all conflicts in favor of the State. State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). On appeal, the State is entitled to the strongest legitimate view of the evidence and all inferences therefrom. Cabbage, 571 S.W.2d at 835. Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused has the burden in this court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982); Grace, 493 S.W.2d at 476.

In the case sub judice, the Defendant was convicted of facilitation of second degree murder and facilitation of attempted second degree murder. The relevant statutory provision states that "[a] person is criminally responsible for the facilitation of a felony if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony." Tenn. Code Ann. § 39-11-403(a).

Reviewing the evidence in the light most favorable to the State, we can only conclude that the proof was legally sufficient to support the Defendant's convictions. The Defendant readily admitted that Swafford had previously told her that he would shoot if police officers attempted to arrest him. She also admitted that she believed Swafford was "crazy" enough to do so. With regard

to the Defendant's conduct on the morning of the shooting, the State's proof, taken in its most favorable light, established that upon hearing the police at the apartment door, the Defendant suggested to Swafford that he hide in the attic, delayed the entry of the police officers to give Swafford time to hide, and falsely told the police that no one else was in the apartment. In addition, the Defendant did not respond to Detective Mason's requests that "if [Swafford] had any weapons, she needed to tell us," even though she believed Swafford probably had a weapon with him in the attic. Finally, the State presented circumstantial evidence that the Defendant helped Swafford gain access to the attic or attempted to conceal that he had done so, or both. In that vein, the State presented testimony that the eight-foot ceiling in the closet was too high to allow access to the attic without assistance and that the only implements of assistance were chairs from another room in the apartment or a folded ironing board leaning in the closet. The State also presented testimony that a neighbor heard shuffling sounds as if things were being moved in the bedroom during the time police were waiting for the Defendant to put on clothing. The implication of this testimony was that the Defendant had assisted Swafford in gaining access to the attic or had concealed whatever implement he had used to do so.

Of course, the Defendant contradicted some aspects of the State's proof and offered explanations for those actions to which she admitted. The resolution of the conflicting testimony, however, was a matter for the jury to resolve. The jury resolved the issue against the Defendant, finding her guilty. The Defendant's contention that the record does not indicate any officer would have acted differently had her conduct been different ignores the testimony of Detective Mason, who stated that had they known for sure that Swafford was in the attic

-25-

and armed, they would have waited for a SWAT team before entering the attic. From our review of the record, we believe that the evidence was legally sufficient to support the jury's verdicts. The Defendant's third issue is therefore without merit.

In her fourth issue on appeal, the Defendant argues that the trial court erred in denying her request for a jury instruction on the defense of necessity. The Defendant requested jury instructions on the defenses of duress and necessity. In support of her request, the Defendant pointed out that the record contained proof the Defendant was responsible for Swafford's arrest in January of 1996. The Defendant testified that after his release, Swafford threatened to kill her if she was ever again responsible for his arrest. She testified further that on the morning of the shooting, Swafford pointed a gun at her and threatened to kill her if she revealed his location. As a result, she told Swafford to hide in the attic and then falsely told the police officers that no one else was in the apartment. She stated that she did not feel safe from Swafford in spite of the presence of police officers because the police had failed to assure her protection after she had Swafford arrested only months earlier. Based on the proof in the record, the trial court granted the request for an instruction on duress but denied the request for an instruction on necessity. The Defendant now contends that the denial of a necessity instruction violated her right to a correct and complete jury charge.

It is well-established in Tennessee that the trial court has the duty of giving a correct and complete charge of the law applicable to the facts of the case and that the defendant has the right to have every issue of fact raised by the evidence

and material to the defense submitted to the jury upon proper instructions by the trial court. State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990), cert. denied, 498 U.S. 1007, 111 S. Ct. 571, 112 L. Ed. 2d 577 (1990); State v. Bryant, 654 S.W.2d 389, 390 (Tenn. 1983); State v. Thompson, 519 S.W.2d 789, 792 (Tenn. 1975) (citing Poe v. State, 370 S.W.2d 488 (1963)). It is also clear that neither duress nor necessity is an affirmative defense. Rather, both are merely defenses and, as a result, if evidence fairly raises either defense, the trial court must submit the defense to the jury and must instruct the jury that any reasonable doubt on the existence of the defense requires acquittal. State v. Culp, 900 S.W.2d 707, 710 (Tenn. Crim. App. 1994); Tenn. Code Ann. §§ 39-11-203, -504, -601, -609.

As we stated above, the trial court did instruct the jury on the defense of duress. The instruction read as follows:

> Included in the defendant's plea of not guilty is her plea that her acts constituting the offense charged were the result of duress.
> Duress is a defense to prosecution where:
> (1) the defendant is threatened with harm which is present, imminent, impending and of such a nature as to induce a well-grounded apprehension of death or serious bodily injury if the act is not done;
> (2) the threatened harm is continuous throughout the time the act is being committed;
> (3) the harm is one from which the defendant cannot withdraw in safety; and
> (4) the desirability and urgency of avoiding the harm clearly outweigh, according to ordinary standards of reasonableness, the harm sought to be prevented by the law proscribing the conduct.
> "Present" means now existing; relating to the present time.
> "Imminent" means near at hand; on the point of happening.
> "Impending" means to be imminent and threatening.
> "Serious bodily injury" means bodily injury which involves a substantial risk of death; protracted unconsciousness; extreme physical pain; protracted or obvious disfigurement; or protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty.

If evidence is introduced supporting the defense of duress, the burden is on the state to prove beyond a reasonable doubt that the defendant did not act from duress.

Any reasonable doubt on the issue of whether the defendant acted from duress requires the defendant to be acquitted.

If you find from the proof that the defendant acted as a result of duress or if you have a reasonable doubt as to whether or not the defendant acted as a result of duress, then you must acquit her.

This defense is unavailable to a person who intentionally, knowingly, or recklessly becomes involved in a situation in which it was probable that the person would be subjected to compulsion.

The standard sufficient to excuse criminal conduct is that the compulsion must be immediate and imminently present and of such nature to produce a well-grounded fear of death or serious bodily harm. In addition, there must be no reasonable opportunity to escape the compulsion without committing an offense.

This instruction is substantially similar to the applicable pattern jury instruction.

See T.P.I. — Crim. 40.03; Tenn. Code Ann. § 39-11-504; State v. Robinson, 622

S.W.2d 62 (Tenn. Crim. App. 1980), cert. denied, 454 U.S. 1096, 102 S. Ct. 667,

70 L. Ed. 2d 636 (1981).

The defense of necessity is set forth at Tennessee Code Annotated § 39-11-609. That section provides as follows:

Except as provided in §§ 39-11-611 -- 39-11-621, conduct is justified if:
(1) The person reasonably believes the conduct is immediately necessary to avoid imminent harm; and
(2) The desirability and urgency of avoiding the harm clearly outweigh, according to ordinary standards of reasonableness, the harm sought to be prevented by the law proscribing the conduct.

Tenn. Code Ann. § 39-11-609. The sentencing commission comments note that

the statutory provision codifies the common law defense of necessity and

excuses criminal conduct in those exceedingly rare situations where criminal

activity is an objectively reasonable response to an extreme situation.

As is apparent from the above-quoted jury instruction and statutory section, the defenses of duress and necessity are similar both in form and in the policy supporting the availability of both defenses. Given that the sentencing commission comments to the statutory section defining the defense of necessity point out that the section codifies common law, we believe we can look to a common law distinction between the two defenses to aid our resolution of this issue.

> Common law historically distinguished between the defenses of duress and necessity. Duress was said to excuse criminal conduct where the actor was under an unlawful threat of imminent death or serious bodily injury, which threat caused the actor to engage in conduct violating the literal terms of the criminal law. While the defense of duress covered the situation where the coercion had its source in the actions of other human beings, the defense of necessity, or choice of evils, traditionally covered the situation where physical forces beyond the actor's control rendered illegal conduct the lesser of two evils. Thus, where A destroyed a dike because B threatened to kill him if he did not, A would argue that he acted under duress, whereas if A destroyed the dike in order to protect more valuable property from flooding, A could claim a defense of necessity.

United States v. Bailey, 444 U.S. 394, 409-10, 100 S. Ct. 624, 634, 62 L. Ed. 2d 575 (1980). Applying this reasoning to the case at bar, we can only conclude that the trial court did not err by instructing the jury on the defense of duress but denying the Defendant's request for a jury instruction on necessity.

Moreover, we note that the general policy supporting the existence of both defenses was served by the duress instruction in the present case. The general policy behind both defenses reflects a judgment that an individual acting under threats or conditions which a person of ordinary firmness would have been unable to resist or reasonably believing that criminal action was necessary to avoid a harm more serious than that sought to be prevented by the statute

defining the offense does not deserve criminal punishment. <u>See</u> <u>Bailey</u>, 444 U.S. at 410; Sentencing Commission Comments to Tenn. Code Ann. §§ 39-11-504, -609. In the case <u>sub</u> <u>judice</u>, the Defendant offered testimony that her actions on the morning of the shooting were motivated by her fear of Swafford's threats. The jury instructions on duress provided the Defendant with a defense, should the jury accredit her testimony, stemming from the policy described above. We believe the jury instruction on duress adequately conveyed the policy and the applicable defense. Accordingly, we conclude that the trial court did not err in denying the Defendant's request to instruct the jury on the defense of necessity. The Defendant's fourth issue is without merit.

In her fifth issue on appeal, the Defendant argues that the trial court erred in reassembling the jury to report guilty verdicts after the jury had initially reported verdicts of not guilty. To address this issue, we must first recount the course of events leading up to the rendering of verdicts of guilt for facilitation of second degree murder and facilitation of attempted second degree murder. As stated above, the Defendant was indicted on one count of facilitation of first degree murder and one count of facilitation of attempted first degree murder. Her trial took place from March 10 to March 14, 1997. The jury was sequestered during trial. Presentation of proof was concluded on March 13, 1997, and the trial court charged the jury with facilitation of first degree murder and facilitation of second degree murder on count one, and facilitation of attempted first degree murder, facilitation of attempted second degree murder and facilitation of attempted aggravated assault on count two. The jury began deliberations but were unable to reach a verdict on March 13 and retired for the night. On March 14 they

resumed deliberations and eventually notified the trial court that they had reached a verdict.

The scenario which developed as the trial judge attempted to receive the jury's verdict was quite astonishing and probably unprecedented. Upon the jury's return to the courtroom, the trial judge told the foreperson that he would ask for the jury's verdict as to each count individually. The trial judge then asked the foreperson what the verdict of the jury was as to count one. The foreperson responded, "Not guilty." The trial judge asked what the verdict was as to count two, and the foreperson again responded, "Not guilty." The trial court confirmed that the verdict was not guilty as to both counts, and the foreperson answered, "That is correct." All of the exchanges with regard to the verdicts were verbal. It appears that the trial court did not employ written verdict forms.[3] The trial judge thanked the jurors for their service and, as an expression of appreciation for their involvement in a difficult trial, assured them that they would have three years of exemption from jury service. He then dismissed the jury, telling them that the court officers would accompany them to get their belongings. The jury then left the jury box.

The courtroom was full of spectators, including a large number of police officers in uniform and representatives from the media. The reaction to the not guilty verdicts was audible and included crying. After being dismissed by the trial court, the jury exited the courtroom by walking in front of the gallery and out of a door leading to a congested public area of the courthouse. From testimony at a

---

[3] The utilization of written jury verdict forms, which apparently is common practice by most criminal court judges in this state, would likely have prevented any problem concerning the reporting of the verdict.

later hearing on a motion to dismiss, it appears that most of the jurors, if not all, had left the courtroom before subsequently being called back in by the trial court. It is unclear whether all of the jurors had left the courtroom before being recalled.

Upon leaving the courtroom, the jurors walked into an area of the courthouse which was open to the public. This area was quite congested as the jurors exited the courtroom, with numerous attorneys and members of the media present. The exiting jurors stretched out in a long line leading from the door to the courtroom. It appears that the jury could have exited the courtroom by way of another door which did not lead to an area of the courthouse open to the public. According to affidavits submitted at the later hearing on the motion to dismiss, two court officers accompanied the jurors as they exited the courtroom. The court officers stated that the jurors remained in their custody at all times before being called back into the courtroom. The court officers stated further that the jurors were not subject to outside contact before being called back into the courtroom.

As the jurors filed out of the courtroom, they walked past the prosecution table. As one of the jurors walked by, one of the assistant district attorney generals prosecuting the case noticed the juror shaking his head and saying "No way." After seeing this reaction, the assistant district attorney general asked the trial court if the State could be heard. He then asked the trial judge if he was going to poll the jury, to which the trial judge responded negatively since the verdict had been not guilty. The assistant district attorney general then informed the trial court of the juror reaction he had witnessed. At that point, the trial judge said, "Bring the jury back. Right quick, catch the jury."

The jurors were then reassembled in the courtroom, standing in a curving line in front of the jury box and the gallery. At this point, the trial court merely began to poll the jury. The trial judge explained that he was going to ask each individual juror if the verdict announced by the foreperson, as to each separate count, was the verdict of the individual juror. The trial judge questioned seven jurors, all of whom indicated that the not guilty verdicts announced by the foreperson were their verdicts as individuals. The eighth juror polled by the trial court was the foreperson. When she was questioned by the trial judge, she indicated that there might be some confusion as to the verdict. She stated, "I think the confusion may be, on that we also considered Second Degree Murder, Attempt for Second Degree, Facilitation on Second Degree Murder and Facilitation of Attempted Second Degree Murder. . . . We did vote on that count as well, and reached a verdict on that." At this point, the trial judge instructed the jurors to again take their seats in the jury box.

The trial judge attempted to clarify that when he asked the jury their verdict as to each count, they should report not only on the indicted offense, but also on any lesser offenses they had considered. The confusion persisted, however, because the foreperson was unsure whether facilitation of second degree murder and facilitation of attempted second degree murder were lesser offenses. In fact, when the trial court again asked the foreperson, after the attempt to clarify the confusion, what the verdict of the jury was, the foreperson replied that she did feel there was a clear verdict, given the clarification provided by the trial court. The trial judge then informed the jury that he could not accept the verdict and would have to send them back to deliberate further. The trial judge re-read a portion of the charge instructing the jury that they must first consider the indicted

-33-

offenses, and if they found the Defendant not guilty of those offenses, they should then consider lesser offenses. The confusion apparently lingered after the instructions, and the foreperson made one last attempt to clarify the matter.

> FOREPERSON: My question is, [the Defendant] was acquitted of First -- facilitation of First Degree.
> THE COURT: Of First Degree.
> FOREPERSON: We, then, went to a lesser charge.
> THE COURT: All right.
> FOREPERSON: Facilitation of Second Degree Murder and Facilitation of Attempted Second Degree.
> THE COURT: Yes. Did the jury make a decision as to those charges?
> FOREPERSON: Yes, sir, we did.
> THE COURT: What is the decision as to that charge? First in Count One what is the decision of the --
> FOREPERSON: Guilty.
> THE COURT: Guilty as to Second Degree, is that what you're telling me?
> FOREPERSON: That's correct.

The trial court proceeded to poll the jury on whether their verdict was guilty of facilitation of second degree murder in count one and guilty of facilitation of attempted second degree murder in count two. Each juror responded affirmatively.

We have reviewed an audiotape recording of the jury reporting its verdict. From our review, it appears that approximately thirty-five seconds passed between the time when the trial court first dismissed the jury and the time the assistant district attorney asked the trial court if the State could be heard. An additional fifteen seconds passed before the trial court ordered the court officers to catch the jury and bring them back to the courtroom. After the trial court's order, approximately fifty-eight seconds passed before the jury was reassembled in front of the jury box. Thus, the time period between the jury's initial dismissal

and the trial court's order to reassemble them was fifty seconds. Fifty-eight more seconds passed before the jury was actually reassembled in front of the jury box.

The Defendant now argues that the trial court erred in reassembling the jury after they had reported the not guilty verdicts. She asserts that after the jury reported the not guilty verdicts, the trial court discharged them. She contends that Tennessee law does not permit reassembly of the jury to amend or correct a verdict in a substantive manner after the jury has been discharged. She argues that reassembling the jury, after their report of not guilty verdicts and discharge, in order to enter a finding of guilt violated double jeopardy and due process protections. See U.S. Const. amend. V; U.S. Const. amend. XIV, § 1; Tenn. Const. art. I, §§ 6, 8, 9, 10.

In its brief on appeal, the State agrees that when a jury is discharged, they may not be reassembled to amend or correct their verdict in a substantive way. See State v. Jefferson, 938 S.W.2d 1, 22 (Tenn. Crim. App. 1996). The State contends, however, that the jury in the present case was not actually discharged after reporting the initial not guilty verdicts. As a result, it was not error for the trial court to reassemble the jury to correct the verdicts. In support of its contention that the jury was not actually discharged, the State argues that the jurors remained in the custody of court officers, remained an undispersed unit, and had no opportunity for outside contacts before being reassembled.

From these arguments, it is clear that the key point of contention, and the central question for our review, is whether the jury in the present case was discharged after initially reporting not guilty verdicts. If the jury was indeed

discharged, both the Defendant and the State agree that it was improper to reassemble them to correct or amend the initial verdicts. Obviously, we are presented with an unusual chain of events in the reporting of the verdicts. Not surprisingly, there are very few cases dealing with such situations. There are, however, a small number of reasonably similar cases both from Tennessee and from other jurisdictions which contain concepts and principles useful for our disposition of this issue.

There are several cases from other jurisdictions which confront the issue raised here, namely the point at which a jury is considered discharged. Although none of these cases exhibit the precise factual pattern of the case at bar, they do highlight some of the chief concerns which enter into an analysis of the issue of when a jury is discharged. We will therefore summarize some of these cases to aid in our future discussion of Tennessee case law.

The first principle which we can glean from an examination of cases from other jurisdictions is that the verbal discharge or dismissal of the jury by the trial court does not render the jury discharged for purposes of subsequent reassembly to correct or amend a verdict. For instance, a New Jersey case contains language directly stating that "the words 'the jury is discharged' do not in themselves terminate the case." State v. Brandenburg, 120 A.2d 59, 61 (Hudson County Ct. 1956). As will become apparent from our later discussion of additional cases, other jurisdictions are in accord with this principle.

This principle leads us to the next logical question, namely what factors other than the verbal dismissal of the jury come into play in determining whether

a jury has actually been discharged. Cases from other jurisdictions demonstrate two primary factors at issue in determining discharge. The first involves the issue of separation from the presence and control of the trial court. The second involves the issue of outside contacts or influence on the jury.

Brandenburg is a prime example of a case highlighting these two factors. In Brandenburg, the jury foreperson reported that the jury had found the defendants not guilty. The trial court verbally dismissed the jury. In the passageway outside the courtroom, some of the jurors indicated that the foreperson had not reported the correct verdict. A court officer informed the trial judge, who reassembled the jury. The jury was reassembled approximately ten minutes after their verbal dismissal. Id. at 60. The Brandenburg court concluded that the jury had been discharged and, thus, the reassembly was improper. The principal reason behind this conclusion was that the jury had left the presence of the trial court. Id. at 61-62. The court stated that "[o]nce a jury has been discharged and they have gone out of the presence of the court, it would be a dangerous procedure to have them again deliberate upon the case." Id. at 61. The court went on to state that "it is enough if [the jurors] are out of the presence of the court, regardless of the distance therefrom." Id. at 62. The court also noted that there was "no indication from any source that the jury in the instant case was coerced or that they were intimidated." Id. at 61. Yet the court pointed out that "whether they had contact with others during the interval between discharge and reassembling is immaterial, for they did have an opportunity to do so." Id. at 62.

Emphasizing the factor concerning separation from the presence and control of the trial court is the Virginia case of Melton v. Commonwealth, 111 S.E. 291 (Va. 1922). In Melton, the jury returned a verdict of guilt of rape, but set the punishment in the punishment range for attempted rape. The trial court did not notice this inconsistency immediately and verbally dismissed the jury. The jurors did not separate from each other, but did retire to the jury room accompanied by a sheriff for the purpose of claiming their attendance fees. The trial court soon reassembled the jury to correct the inconsistency. The Melton court concluded that the reassembly was improper because the jury had been discharged. The court stated, "When the court announces their discharge, and they leave the presence of the court, their functions as jurors have ended." Id. at 291.

In a similar vein is the Texas case of Webber v. State, 652 S.W.2d 781 (Tex. Crim. App. 1983). In Webber, the court read the verdict of the jury finding the defendant guilty of kidnaping and assessing punishment at four years imprisonment. The court then verbally dismissed the jury. Almost immediately the trial court discovered that the jury had signed an additional verdict form recommending that punishment be probated. The court inquired as to the validity of this form, and the jurors indicated that it was mistakenly signed. The trial court then allowed the jury to return a verdict showing no recommendation for probation. The Webber court concluded that it was not error to reconvene the jury. The court noted that the jury had not been out of the presence of the trial court when the error was noticed and they were reconvened. Id. at 782.

Much the same is true of the California case of People v. Powell, 221 P.2d 117 (Cal. Dist. Ct. App. 1950). In Powell, the jury informed the trial court that

-38-

they had reached a verdict on both counts of an indictment as to one defendant but could not agree as to the other. Id. at 118. The trial court verbally dismissed the jury, instructing them to hand the unused written verdict forms pertaining to the defendant on whom the jury could not agree to the clerk. Id. at 118-19. The trial court then discovered that the jury had in fact reached a verdict as to that defendant on one of the two counts. The trial court reassembled the jury and allowed them to render the verdict of guilt as to the one count. The Powell court found no error, noting that "the jury were in the box and under the control of the court" during the entire time. Id. at 119.

Emphasizing the factor concerning outside contacts or influence on the jury is the Massachusetts case of Commonwealth v. Brown, 323 N.E.2d 902 (Mass. 1975). In Brown, the jury returned verdicts of not guilty of murder but guilty of armed entry. The trial judge verbally dismissed the jury, and a court officer accompanied them back to the jury room. As they neared the jury room, the foreperson of the jury informed the court officer that there was something wrong with the verdicts. The trial court was informed and reassembled the jury. The jury indicated that because the clerk had read the charges to them in a different manner than listed on the forms they had used, they had mistakenly reported not guilty of murder although they had actually found guilty as to murder. Id. at 904. On appeal, the Brown court found no error. The court noted that "[t]here had been no commingling of the jurors with any members of the general public." Id. The court specifically distinguished other cases finding error in reassembly where there had been "an opportunity for outside influence." Id. at 905 (emphasis added).

One such case distinguished by the Brown court was People v. Rushin, 194 N.W.2d 718 (Mich. Ct. App. 1971). In Rushin, the jury returned verdicts of not guilty and were verbally dismissed by the trial court. The court clerk later informed the trial court that one of the jurors expressed dissatisfaction with the reported verdict. In response, two minutes after the jury had left the courtroom, the trial court reassembled the jury to clarify the verdict. Id. at 719. The Rushin court found the reassembly to be error. The court stated that "[o]nce the jury has been officially discharged and left the courtroom, we hold that it is error to recall it in order to alter, amend or impeach a verdict in a criminal case." Id. at 721. In explaining the rationale behind its holding, the court stated that it "cannot ascertain the influence to which the jury has been subjected after it has left the courtroom, be it for two minutes or two days." Id. at 721-22.

Similarly, in State v. Fornea, 140 So. 2d 381 (La. 1962), the Louisiana Supreme Court emphasized the issue of outside contacts as well as the control of the trial court. In Fornea, the jury returned a verdict of guilt of theft. After polling, the trial court verbally dismissed the jury. Id. at 382. The trial court later reassembled the jury and permitted them to return a verdict specifying the value of the property taken in the theft. Id. at 382-83. The Fornea court found no error, noting that the jury remained in the box, and therefore under the control of the trial court, after dismissal but prior to reassembly. Id. at 383. The court also pointed out that there was "no showing whatever . . . that any outsider had an opportunity to talk with them [the jury] or they with him . . . ." Id.

Finally, the Washington case of State v. Edwards, 552 P.2d 1095 (Wash. Ct. App. 1976), emphasizes the importance of outside contacts or influence in the

determination of whether a jury has been discharged. In Edwards, the jury reported that they were deadlocked. The trial court declared a mistrial and verbally dismissed the jury. The jury then left the courtroom and entered the adjacent jury room, with the bailiff following them. Id. at 1096. After entering the jury room, one of the jurors informed the bailiff that they had reached a verdict as to one count, but not the other, and asked if that circumstance made any difference. The bailiff informed the trial judge, who reassembled the jury and accepted their verdict of guilt on the one count. Id. at 1097. The Edwards court found no error. The court stated that a "discharge will occur in fact when a jury is permitted to pass from the sterility of the court's control and allowed to separate or disperse and mingle with outsiders. In such cases, contamination is presumed even though the jurors may not have taken advantage of the opportunity to discuss the case." Id. (emphasis added). In the case before them, however, the court noted that the jury could not possibly have been subjected to even the opportunity for outside influence because the door leading outside from the jury room was locked, with only the jurors inside. Id. The court concluded that

> a trial judge's verbal discharge of the jury after receiving their verdict in a criminal case, does not preclude a later correction of the verdict to conform to the actual finding where the jury has not separated or dispersed, but has remained sequestered and insulated from any outside influence and the correction is not one of substance resulting from further deliberations on the merits of the cause.

Id.


From our examination of the above cases, it is clear that both separation from the presence and control of the trial court and the possibility of outside contacts or influence are important elements in the determination of whether a

jury has been discharged. This circumstance is not surprising, given the obvious relationship between the two factors. Our research reveals that the majority of cases permitting reassembly of the jury have done so where the jury remained in the courtroom or even in the jury box itself, and hence in the presence and control of the trial court, following verbal dismissal. See, e.g., Webber, 652 S.W.2d at 782; Powell, 221 P.2d at 119; Fornea, 140 So. 2d at 383; Summers v. United States, 11 F.2d 583, 586 (4th Cir. 1926), cert. denied, 271 U.S. 681, 46 S. Ct. 632, 70 L. Ed. 1149 (1926). When the jury has left the presence of the trial court after verbal dismissal, most cases permitting reassembly of the jury do so only if the jury had no opportunity for outside contact or influence. See, e.g., Edwards, 552 P.2d at 1098; Brown, 323 N.E.2d at 904-05; People v. McNeeley, 575 N.E.2d 926, 929 (Ill. App. Ct. 1991). With this background from other jurisdictions, we turn now to Tennessee law on the issue.

The principal Tennessee case dealing with this issue is Clark v. State, 97 S.W.2d 644, (1936). In Clark, the defendant was tried with three codefendants on multiple charges. After deliberating, the jury reported to the trial court that they were deadlocked. As a result, the trial court declared a mistrial and verbally dismissed the jury. Id. at 644. Two days later, the defendant filed a motion to reassemble the jury for purposes of entering a not guilty verdict with respect to the charges against him. Id. at 644-45. The defendant's motion was based on his discovery after the dismissal of the jury that the jury had, in fact, found him not guilty as to all charges. They did not so report, however, because they were under the impression that they had to reach a verdict as to all four codefendants. Id. at 645.

-42-

The supreme court, while recognizing "the plausibility of the appeal made to the court's sense of practical justice," nevertheless found it improper to reassemble the jury for the purpose of entering a correct verdict. Id. at 644. In support of its decision, the court stated the following:

> An invariably followed rule, supported not only by precedent, but the soundest reason, grounded on universal knowledge of human nature, is the rule that after the discharge of a jury in a felony case and the separation of the jurors to such a degree that outside contacts may have been even momentarily had, the members of that jury may not be reconvened for the taking of any action whatever involving the fate of the accused.

Id. at 646 (emphasis added). The court went on to note the following:

> It is urged on the petition to this court that "it was a very short time" only, after the discharge of the jury, and that "all of the jurors had not left the Court building" when "counsel informed the Court as to this error of the foreman in reporting an erroneous finding of the jury." Neither exactly how long a time, nor how many had left the building, appears, but flexibility in time of separation is incompatible with the enforcement of this rule.

Id. (emphasis added). Finally, the court also specifically mentioned the importance of the jury's being out of the presence of the trial court after their verbal discharge. Id.

From our reading, the plain language of Clark emphasizes both separation from the presence of the trial court and the opportunity for outside contacts or influence as factors in the determination of whether a jury has been discharged. This approach comports with the approach taken by many other jurisdictions with regard to determining jury discharge. See, e.g., Brandenburg, 120 A.2d at 61-62; Webber, 652 S.W.2d at 782; Fornea, 140 So. 2d at 383.

After careful consideration, we conclude that the jury in the case at bar had indeed been discharged after reporting the initial not guilty verdicts and before

reassembling in the courtroom to correct the initial verdicts by reporting verdicts of guilt of lesser offenses. It is clear from the record that most, if not all of the jurors exited the courtroom, and the presence of the trial court, after the trial court verbally dismissed them. It is also clear that the area to which the jurors exited was open to and occupied by members of the general public, interested in and reacting to the outcome of the case. We believe these circumstances demonstrate separation of those jurors from the trial court to such a degree that momentary outside contacts may have been had. See Clark, 97 S.W.2d at 646. Although very little time elapsed before the jury was reassembled, Clark specifically stated that "flexibility in time of separation is incompatible" with the application of the standard announced in that case. Id. As such, we can only conclude that the jury was discharged upon exiting the courtroom, and the presence of the trial court, into an area occupied by the general public.

The State urges both that the jurors were not out of the control of the trial court because they were accompanied by court officers and that, according to affidavits submitted by those court officers, the jurors were not subjected to any outside contacts or influence. With regard to the second contention, we believe the plain language of Clark renders the argument immaterial. Clark does not speak of the existence or lack of actual contact, but rather focuses on whether outside contacts may have been had. Clark, 97 S.W.2d at 646. This language is in accord with several cases from other jurisdictions, finding the relevant inquiry to be the possibility of outside contact or influence. See, e.g., Brandenburg, 120 A.2d at 62 (stating whether jurors had contact with others between dismissal and reassembly was immaterial, for the jurors did have the opportunity to do so); Fornea, 140 So. 2d at 383 (holding reassembly not erroneous where record

demonstrated no outsider had the opportunity to talk with the jurors or vice versa); Edwards, 552 P.2d at 1097 (stating that discharge occurs where jurors pass from court's control and are allowed to mingle with outsiders, regardless of whether actual contacts took place). In the case sub judice, when the dismissed jurors exited the courtroom into an area of the courthouse occupied by members of the general public, clearly the possibility of outside contact or influence existed.

The State also contends that the jurors were not out of the control of the trial court because court officers accompanied them outside the courtroom. The Defendant, on the other hand, argues that the presence of court officers was irrelevant because, upon discharge, the relationship between the jurors and the court officers was that of third persons. See Melton v. Commonwealth, 111 S.E. 291 (Va. 1922). We are not prepared to state that the presence of court officers with the jury is irrelevant to a determination of whether a sequestered jury has been discharged. In the case at bar, however, we do not believe the presence of court officers with the jurors who exited the courtroom alters our conclusion that the jury was discharged.

First, even though the jurors were accompanied by court officers, the jurors were not given the customary admonishments by the trial court to guard them against improper influence. See People v. Thornton, 202 Cal. Rptr. 448, 454, (Cal. Ct. App. 1984) (noting the importance of the admonitions which guard the jury's judgment from outside influence when the jury leaves the presence of the trial court). Second, even if we were to conclude that the presence of the court officers amounts to some type of continued control by the trial court, the jurors were nevertheless exposed to the possibility of outside contact or influence when

they exited the courtroom into an area of the courthouse occupied by the general public. Had the jurors in the case at bar exited the courtroom through the door leading into the area unoccupied by the general public, the effect of accompaniment by the court officers might be significantly different. See Commonwealth v. Brown, 323 N.E.2d 902, 904-05 (Mass. 1975) (holding reassembly permissible where jurors remained in control of trial court by virtue of being in custody of court officers and having no opportunity for outside influence).

Thus, having considered the principles set forth in Clark, along with contextual background from cases in other jurisdictions, we conclude that the jury in the present case was discharged after reporting not guilty verdicts and before being reassembled to amend or correct their verdicts. The State agrees with the Defendant that "once a jury in a felony case has been discharged and outside contacts may have occurred, the jury may not be reconvened for the purpose of taking further action involving the accused." State v. Stephenson, 878 S.W.2d 530, 554 (Tenn. 1994). As a result, we conclude it was error for the trial court to reassemble the jury and permit entry of guilty verdicts after the jury had reported not guilty verdicts and been discharged. The not guilty verdicts reported by the jury, coupled with the discharge of the jury, concluded the Defendant's jeopardy. See Green v. United States, 355 U.S. 184, 188, 78 S. Ct. 221, 223-24, 2 L. Ed. 2d 199 (1957). Accordingly, we believe her subsequent convictions violate double jeopardy and due process protections, requiring us to reverse and vacate those convictions.

In her sixth issue on appeal, the Defendant makes an alternative argument regarding her fifth issue. She argues that if the reassembly of the jury to amend or correct the not guilty verdicts did not violate double jeopardy and due process protections so as to require vacating her convictions, the manner in which the guilty verdicts were rendered at least merited granting a mistrial. Having concluded that the reassembly of the jury was improper and did violate double jeopardy and due process protections, requiring reversal of the convictions, we deem it unnecessary to address whether the manner in which the verdicts were rendered merited a mistrial.

In her seventh issue on appeal, the Defendant argues that the trial court erred in charging the jury with respect to release eligibility pursuant to former Tennessee Code Annotated § 40-30-201(b)(2).[4] She contends that the instruction formerly required by § 40-35-201(b)(2) is unconstitutional for a number of reasons. First, citing to Farris v. State, 535 S.W.2d 608 (Tenn. 1976), she claims that the instruction is unconstitutionally vague. Second, she argues that the instruction violates due process. Third, she contends that the instruction violates separation of powers principles, citing to the concurring opinion of Justice

---

[4] On May 1, 1998, Tennessee's General Assembly passed Public Chapter No. 1041, an amendment to § 40-35-201, which deletes subsection (b) in its entirety and substitutes the following:

> In all contested criminal cases, except for capital crimes which are governed by the procedures contained in TCA §§ 39-13-204 and 39-13-205, and as necessary to comply with Article VI, Section 14 of the Constitution of the State of Tennessee and TCA § 40-35-301, the judge shall not instruct the jury, nor shall the attorneys be permitted to comment at any time to the jury, on possible penalties for the offense charged nor all lesser included offenses.

This amendment will apply to all trials occurring after the act's effective date.

Brock in Farris, 535 S.W.2d at 615.  This issue has been a divisive one for this court.[5]

Former Tennessee Code Annotated § 40-35-201(b)(1) provided that upon the motion of either party, the trial court in all criminal cases, excepting those for capital offenses, shall charge the jury on the possible penalties for the indicted offense and all lesser offenses.  The section under attack in the case at bar is § 40-35-201(b)(2), which mandated the inclusion of release eligibility information as part of the § 40-35-201(b)(1) charge on possible penalties:

> When a charge as to possible penalties has been requested pursuant to subdivision (b)(1), the judge shall also include in the instructions for the jury to weigh and consider the meaning of a sentence of imprisonment for the offense charged and any lesser included offenses.  Such instruction shall include an approximate calculation of the minimum number of years a person sentenced to imprisonment for the offense charged and lesser included offenses must serve before reaching such person's earliest release eligibility date.  Such calculation shall include such factors as the release eligibility percentage established by § 40-35-501, maximum and minimum sentence reduction credits authorized by § 41-21-236 and the governor's power to reduce prison overcrowding pursuant to title 41, chapter 1, part 5, if applicable.
> (ii) Such instructions to the jury shall also include a statement that whether a defendant is actually released from incarceration on the date when such defendant is first eligible for release is a discretionary decision made by the board of paroles based upon many factors, and that such board has the authority to require the defendant to serve the entire sentence imposed by the court.

---

[5] See State v. Robert Anthony Payne a/k/a Anthony Jordan, C.C.A. No. 01C01-9701-CR-00031, Davidson County (Tenn. Crim. App., Nashville, June 17, 1998; State v. Robert H. McCurdy, C.C.A. No. 03C01-9706-CR-00232, Union County (Tenn. Crim. App., Knoxville, Mar. 23, 1998); State v. Michael Dinkins, C.C.A. No. 02C01-9702-CR-00075, Shelby County (Tenn. Crim. App., Jackson, Mar. 12, 1998); State v. Jason M. Weiskopf, C.C.A. No. 02C01-9611-CR-00381, Shelby County (Tenn. Crim. App., Jackson, Feb. 4, 1998); State v. Jerry Ray Cooper, C.C.A. No. 01C01-9504-CC-00150, Lincoln County (Tenn. Crim. App., Nashville, Nov. 17, 1997) (principal opinion with two concurring opinions); State v. Dwjuan L. Bradford, C.C.A. No. 01C01-9607-CR-00294, Davidson County (Tenn. Crim. App., Nashville, Sept. 30, 1997); State v. Curtis Lee Majors, C.C.A. No. 01C01-9602-CR-00076, Davidson County (Tenn. Crim. App., Nashville, July 30, 1997); State v. Howard E. King, C.C.A. No. 02C01-9601-CR-00032, Shelby County (Tenn. Crim. App., Jackson, Oct. 22, 1996), aff'd (Tenn. 1998).

Tenn. Code Ann. § 40-35-201(b)(2)(A) (emphasis added). The statute also required the Department of Correction to furnish trial judges with the approximate calculation of release eligibility referred to in § 40-35-201(b)(2)(A)(i). Id. § 40-35-201(b)(2)(B).

In the case sub judice, the State requested that the trial court charge the jury on possible penalties. The Defendant objected to that part of the charge pertaining to release eligibility, namely the part required pursuant to § 40-35-201(b)(2). The trial court overruled the Defendant's objection and charged the jury according to the mandates of the statute. The trial court's instructions to the jury on possible penalties comported with the requirements of the statutory provision and tracked the language of the pattern jury instruction. See T.P.I. — Crim. 43.11. In particular, the trial court instructed the jury that they could "weigh and consider" the meaning of a sentence of imprisonment and then defined the various possible sentences of imprisonment applicable to the Defendant's case. In that vein, the trial court instructed the jury with regard to count one that facilitation of first degree murder carried a range of fifteen to twenty-five years imprisonment, with the earliest release eligibility date, based on the minimum sentence, being 2.96 years. The trial court instructed the jury that facilitation of second degree murder carried a range of eight to twelve years imprisonment, with the earliest release eligibility date, based on the minimum sentence, being 1.58 years. With regard to count two, the trial court instructed the jury that facilitation of attempted first degree murder carried a range of eight to twelve years, with release eligibility at 1.58 years. With regard to facilitation of attempted second degree murder, the range was three to six years, with release

-49-

eligibility at 0.60 years. Finally, with regard to facilitation of attempted aggravated assault, the range was one to two years, with release eligibility at 0.21 years.

Our supreme court recently provided us with instructions and guidance on this issue in the case of State v. Howard E. King, No. 02-S-01-9703-CR-00021, Shelby County (Tenn., Jackson, July 6, 1998) (to be published). In King, our supreme court held that former Tennessee Code Annotated § 40-35-201(b)(2) did not violate the separation of powers clauses of the Tennessee Constitution. Id. at 8. The court also found that the statute was not impermissibly vague, did not mandate a misleading jury instruction, and did not require a jury instruction on matters irrelevant to a Defendant's guilt or innocence. Id. at 17. The court concluded that the jury instruction given in King violated the due process clause of neither the United States nor the Tennessee Constitution. Id.

As we have noted, in the case at bar, the trial court instructed the jury that it could "weigh and consider" the meaning of a sentence of imprisonment for the offense charged and any lessor included offenses. In contrast, the King instruction charged the jury that the ranges of punishment and release eligibility dates were for its information only. Id. at 4. In King, although the supreme court stated that it was significant that the jury had been instructed that the sentencing information was "for your information only," the court specifically stated that sentencing and parole information had a "measure of relevance" to the jury's function in determining guilt or innocence. Id. at 14. The court further noted that "the legislature has determined for us the relevancy of sentencing and parole information." Id.

The challenged jury instruction was mandated by the legislature. The constitutionality of the statute has been upheld by our supreme court. The supreme court rejected the argument that sentencing and parole information are entirely irrelevant to the jury's function of determining guilt or innocence. We therefore conclude that the trial judge did not err by giving the jury instruction mandated by former Tennessee Code Annotated § 40-35-201(b)(2).[6]

## CONCLUSION

Confusion and uncertainty concerning the jury verdict is obvious. One thing is certain — the jury announced a verdict of "not guilty" in open court and the trial judge accepted the verdict and dismissed the jury. We conclude that reassembling the jury for further proceedings offended due process and violated the Defendant's constitutional protection from being twice put in jeopardy for the same offense.

Although hindsight is a perfect tool, it would appear a number of unique happenings led to this result. Written verdict forms were not utilized although they are not specifically required by Tennessee law. After the foreperson unmistakably announced a not guilty verdict as to both counts, the trial judge understandably took that verdict at face value. The jury was not polled nor asked if that was the verdict of all jurors. Yet, amazingly, even after the trial judge took the verdict and dismissed the jury, no juror immediately indicated that was not the

---

[6] A panel of this court recently divided on the issue of whether the inclusion of the "weigh and consider" language violated the Defendant's due process rights. State v. James C. Nichols, C.C.A. No. 01C01-9704-CR-00158, Davidson County (Tenn. Crim. App., Nashville, Aug. 12, 1998); see also State v. Adrian Wilkerson and Steven Murphy, C.C.A. No. 01C01-9610-CR-00419, Davidson County (Tenn. Crim. App., Nashville, Aug. 26, 1998); State v. Marcus L. Nelson, C.C.A. o. 01C01-9707-CR-00237, Davidson County (Tenn. Crim. App., Nashville, Aug. 27, 1998).

verdict. Although the state could have immediately requested that the jury be polled as to the not guilty verdict, as allowed by Tenn. R. Crim. P. 31(d), this was not done. It would appear that only one juror, after leaving the jury box, indicated some kind of problem. Upon noticing the juror, the prosecutor then asked if the jury was to be polled. The trial judge declined to do so since it was "a not guilty verdict." Had any of the above things been done differently, it would appear the present problem would have been avoided. Yet, we reemphasize the observation is based upon hindsight.

Thus, this unusual scenario unquestionably requires the application of the law prohibiting reassembly of the jury to announce a different verdict. Assuming the jury had agreed to the guilty verdict as was finally announced, it is indeed unfortunate that this verdict can not be recognized due to this unusual factual and procedural scenario. We would hope such a scenario does not again find its way into a Tennessee courtroom.

We are therefore compelled to reverse the judgment of the trial court and vacate the Defendant's convictions.

_____
DAVID H. WELLES, JUDGE

CONCUR:

_____
JOSEPH M. TIPTON, JUDGE

_____
JOE G. RILEY, JUDGE