# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### May 2000 Session

## STATE OF TENNESSEE v. LON ADELBERT PIERCE

### Appeal from the Circuit Court for Benton County
### No. 97-CR690    C. Creed McGinley, Circuit Court Judge

---

### No. W1999-01433-CCA-R3-CD - Filed October 23, 2000

---

The defendant, Lon Adelbert Pierce, appeals from his conviction of the first degree premeditated murder of Larry Gene Peppers, Sr. He raises numerous issues on appeal. Significant among his appellate issues are his challenge to the sufficiency of the evidence based upon his claim of diminished capacity, his claim that a psychologist is incompetent to give rebuttal testimony on the issue of diminished capacity, and his claim that double jeopardy barred his retrial on first degree murder after the jury at his first trial determined that he was not guilty of the offense, as evidenced by juror affidavits. Because we find no error requiring reversal, we affirm the defendant's conviction.

**Tenn. R. App. P. 3; Judgment of the Trial Court Affirmed.**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which JERRY L. SMITH and ROBERT W. WEDEMEYER, J.J., joined.

Terry J. Leonard, Camden, Tennessee, for the appellant, Lon Adelbert Pierce.

Paul G. Summers, Attorney General, Tara B. Hinkle, Assistant Attorney General, Robert G. Radford, District Attorney General, Beth Boswell, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

The defendant, Lon Adelbert Pierce, appeals from his conviction of premeditated first degree murder. Pierce's conviction stems from a disagreement with Larry Gene Peppers, Sr., the victim, over payment for a truck Pierce sold him. Pierce was indicted for the premeditated murder of Peppers and the attempted first degree murder of Peppers' son. At a trial in the Benton County Circuit Court, a jury acquitted the defendant of attempted first degree murder and was unable to reach a verdict on the premeditated murder count. Pierce was retried on the premeditated murder count and found guilty. He is presently serving a life sentence for his crime. In this direct appeal, Pierce raises the following issues:

1. Whether the evidence sufficiently supports the defendant's conviction in light of his claim of diminished capacity.
2. Whether a psychologist is a competent witness to give expert testimony on the issue of diminished capacity.
3. Whether the trial court erred in admitting photographs of the victim.
4. Whether the trial court erred in failing to admonish the prosecutor for remarks made during closing argument.
5. Whether the trial court properly ruled that evidence of the identity of the individual who assisted the defendant in his flight was relevant and admissible.
6. Whether the trial court properly instructed the defendant to reveal the identity of the individual who assisted him in his flight.
7. Whether double jeopardy barred the defendant from retrial on the offense of first degree premeditated murder after the jury at his first trial, according to ten juror affidavits, determined that he was not guilty of that offense but was unable to agree on his guilt on the lesser offenses charged.

Upon review of the briefs and oral arguments of the parties, the law, and the appellate record, we affirm the judgment of the trial court.

In the light most favorable to the state, the evidence at trial demonstrated that sometime around February 20, 1997, the defendant, Lon Adelbert Pierce, sold a truck to the victim, Larry Peppers, Sr., under an informal installment agreement. The defendant has a limited education, and Teresa Peppers, the victim's wife, was to handle the paperwork regarding transfer of title and recording of a lien in Pierce's favor for the unpaid portion of the sale price. Contrary to the agreement, Mrs. Peppers caused title to be transferred on February 20, 1997 without recordation of the lien. Thereafter, the victim failed to make scheduled payments to Pierce.

Pierce attempted over the course of several days prior to March 21, 1997 to confront the Peppers, but they successfully avoided him. On March 18, 1997, Pierce called the Decatur County Clerk and informed him that the vehicle's title should have a lien recorded on it. On or about March 19, 1997, Pierce went to the Decatur County Courthouse and talked with several individuals about the situation. No one was able to resolve the issue for him. During a conversation with Danny Turner, the Circuit Court Clerk, Pierce said he would like to take care of the situation the right way, but if that was not possible, he would take care of it his way.

Both the defendant and the victim did mechanic work and frequented the North 40 Truck Stop. In the two weeks prior to the victim's death on March 21, 1997, Douglas Glenn Whitfield, who owned the North 40 Truck Stop, was aware that Pierce was upset with the victim for not paying in accord with the installment contract on the truck. Pierce made statements to Whitfield that he would either get his truck or kill the victim. Whitfield recalled that Pierce became increasingly agitated in the week prior to March 21. Beth Mary Podgwaite was an employee of the North 40 Truck Stop. In March 1997, she was aware of Pierce's anger toward the victim over the

sale of the truck. Podgwaite was present when Pierce said that he would take care of the situation however he could, and he would shoot the victim if necessary.

On the morning of March 21, 1997, Larry Peppers, Sr., his wife Teresa, and his son Larry Jr. left their home to drive to the North 40 Truck Stop. While traveling along on the highway, they saw Pierce, who turned his car around and followed them to the truck stop. The Peppers went inside, and Pierce followed. Pierce confronted the victim, and the victim tried to back away. Mr. Whitfield was concerned about the disagreement taking place inside his business and asked Pierce to go outside. Pierce complied. When the Peppers finished their business, they went outside. As the Peppers attempted to leave, Pierce approached their vehicle. He and the victim exchanged words. Larry Sr. told Larry Jr. to call the police, and the victim said that Larry Jr. should call the morgue. Pierce said he was going to get a gun. He leaned into his vehicle, which was parked nearby, and retrieved a gun. Twice he pointed the gun at Larry Sr., and Larry Jr. pushed Pierce's arm away. Pierce pointed the gun at Teresa Peppers, and again Larry Jr. pushed Pierce's arm away. As the two struggled over the gun, Pierce fired and wounded Larry Jr. The defendant chased Larry Sr. in the parking lot. Shots rang out, and Larry Sr. fell wounded. The defendant approached Larry Sr. and shot him again as he lay wounded on the pavement.[1] Teresa Peppers ran toward the truck stop, and Pierce followed her. Podgwaite, who was working inside the truck stop, heard the defendant say, "Were is she? I'm going to kill her." Whitfield intervened and told Pierce to leave. Pierce went outside and stayed on the premises for about five minutes before driving off.

Larry Peppers, Sr. died from his injuries. Larry Peppers, Jr. survived.

After Pierce left the truck stop, he changed vehicles and drove to Arkansas. Eventually, he went to Mexico. He lived on the lam for fourteen months but finally surrendered to authorities in Phoenix, Arizona.

Prior to surrendering, Pierce talked by telephone with Benton County Sheriff Bobby Shannon. A tape of one of their conversations was played for the jury. In it, Pierce acknowledged killing the victim. He also said, "Yeah, I wanted to kill him. I went plumb nuts."

To counter the state's proof, Pierce presented evidence that he was in dire financial condition, and he became very distraught over the victim failing to pay him and the victim's wife failing to record the lien on the truck. Pierce denied having said that he was going to kill the victim; he claimed he actually said the victim was killing him by not paying for the truck. Pierce claimed he had been so anxious over his financial woes that he had not slept for a couple of days before the shooting. He could not remember the last time he had eaten. He claimed that he "lost it" during his confrontation with the victim after the victim said that he had sold the truck and had no intention of paying for it. He further claimed he could not remember what happened next. He vaguely recalled struggling with someone. The next thing he remembered was Mr. Whitfield telling him to get out

---

[1]Witness accounts varied regarding the total number of shots fired; however, a total of eight spent cartridge casings were recovered.

of the truck stop. Pierce claimed that at this point, he looked down and saw the gun in his hand. He walked outside and saw Larry Jr. and Larry Sr. on the ground and realized he must have shot them.

Pierce testified that after the shooting, he went through a series of vehicle changes during his flight to Arkansas and Mexico. On cross-examination, he was asked who helped him get the pickup truck in which he drove to Mexico. He refused to identify who brought him the truck and to answer whether this individual provided him with money and clothing.

In support of a claim of diminished capacity, Pierce presented expert testimony from a psychiatrist and a neuropsychologist that he was suffering from major depression and hypoglycemia related to diabetes on the day of the crime. Additionally, Pierce had a below-average IQ in the borderline mentally retarded range and was diagnosed by the neuropsychologist as having borderline mental functioning. According to the expert proof, Pierce had a history of major depression and suicidal thoughts dating back to 1994. The depression would result in impairment of thinking, talking, concentration and attention. Depressed individuals are easily upset because they feel like they are barely surviving. The defense psychiatrist opined that the money the victim owed Pierce represented a financial "life boat" following a number of financial adversities Pierce had suffered. Regarding hypoglycemia, the psychiatrist testified that individuals who are suffering from hypoglycemia will first lose control of their emotions and passions. The ability to think begins to shut down, and amnesia can result. Ultimately, in severe cases, the brain shuts down. Finally, the defense psychiatrist testified that as a result of the defendant's low IQ, he had diminished ability to think things through. The defense psychiatrist opined that all of these things combined with sleep deprivation resulted in diminished capacity for Pierce to have the capacity to act intentionally. On cross-examination, the defense psychiatrist conceded that Pierce said in the doctor's interview of him that he was going to kill the victim if he did not get his money.

In rebuttal, the state presented the testimony of a psychologist who performed a forensic evaluation of Pierce. This expert opined that Pierce was not legally insane at the time of his offense and was not severely clinically depressed. He recounted that in his interview with Pierce, the defendant did not mention anything about lack of memory of the incident, a blackout, or hypoglycemia. The defendant reported to this expert that he was not having trouble with his diabetes. Pierce spoke very negatively of the victim to this psychologist and said that the victim deserved to be shot.

The state also presented the rebuttal testimony of a medical doctor, who opined that an individual suffering from hypoglycemia would have difficulty hitting a target or driving. It would be impossible for such an individual to change cars twice and go on a two-day driving spree. Further, it would be impossible for an individual to have hypoglycemia causing amnesia for a two to five minute period of time and then awaken and know what was going on.

In surrebuttal, the defense presented evidence that the state's psychological expert evaluated Pierce for only about 30 minutes.

Pierce was tried initially for the attempted first degree murder of Larry Peppers, Jr. and the first degree murder of Larry Peppers, Sr. The jury acquitted him of attempted first degree murder and was unable to reach a verdict on the first degree murder count. Pierce was retried, and at the second trial the jury convicted him of first degree murder of Larry Peppers, Sr. The trial court sentenced Pierce to life in prison.

The defendant appeals from his conviction of first degree murder.

## I

In his first issue, the defendant challenges the sufficiency of the convicting evidence in light of his claim of diminished capacity. The defendant has included a sparse two-sentence argument on this issue in his brief. His argument contains no citation to authority or to the record. This issue is waived. See Tenn. R. App. P. 27(a)(7); Tenn. R. Ct. Crim. App. 10(b).

Had this issue not been waived, we nevertheless would have found it without merit.

When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 324, 99 S. Ct. 2781, 2791-92 (1979); State v. Duncan, 698 S.W.2d 63, 67 (Tenn. 1985); Tenn. R. App. P. 13(e). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Dykes, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990).

In determining the sufficiency of the evidence, this court should not reweigh or reevaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Nor may this court substitute its inferences for those drawn by the trier of fact from the evidence. Liakas v. State, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956); Farmer v. State, 574 S.W.2d 49, 51 (Tenn. Crim. App. 1978). On the contrary, this court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. Cabbage, 571 S.W.2d at 835.

In pertinent part, first degree murder is "[a] premeditated and intentional killing of another . . . ." Tenn. Code Ann. § 39-13-202(a)(1) (1997). Tennessee law provides that an accused may present evidence of his "diminished capacity" in order to "negate the existence of the culpable mental state required to establish the criminal offense." State v. Hall, 958 S.W.2d 679, 690 (Tenn.), cert. denied, --- U.S. ---, 119 S. Ct. 2348 (1998). At trial, the defendant sought to negate the existence of the element of intent by presenting evidence of his depression and hypoglycemia.

The jury heard evidence that the defendant made statements of intent to kill the victim in the days prior to the victim's death. The defendant followed the victim and his family to a truck stop, confronted the victim, told the victim's son to call the morgue, retrieved a gun from his car, shot the victim, then shot the victim again as he lay wounded on the ground. The jury also heard evidence of the defendant's hypoglycemia and major depression. Evidence of the defendant's mental and physical ailments was contested by the state. After hearing all of the evidence, the jury chose to accredit the evidence offered by the state over that offered by the defendant. This conclusion was within the province of the jury as the trier of fact, and we may not substitute our own judgment for that of the jury. Thus, the defendant has failed to demonstrate the impropriety of his conviction on appeal.

## II

Next, Pierce claims that the trial court should have excluded the testimony of a state's rebuttal witness on the issue of diminished capacity because the witness was a psychologist, as opposed to a psychiatrist. He argues that under State v. Hall, psychologists are not competent witnesses to give evidence on the issue of diminished capacity.

The admission of expert testimony is governed by Tennessee Rules of Evidence 702 and 703. Rule 702 provides for the admission of an expert's testimony if it "will substantially assist the trier of fact to understand the evidence or to determine a fact in issue." Tenn. R. Evid. 702. A witness may be qualified to give expert testimony upon the basis of his "knowledge, skill, experience, training or education." Id. Rule 703 governs the bases upon which expert opinions may be premised.

We have examined Hall and find nothing in that opinion which indicates that the admission of expert testimony on the issue of diminished capacity should be evaluated other than under the Rules of Evidence. Further, we find nothing in Hall which supports wholesale exclusion of psychologists' testimony in diminished capacity cases. While Hall uses the term "psychiatric testimony," there is no indication that this term is meant to exclude psychologists' testimony. See Hall, 958 S.W.2d at 690. In fact, the excluded testimony at issue in Hall was that of a clinical psychologist. Id. at 686. In passing on whether the testimony should have been admitted, the supreme court focused on the Rules of Evidence which address relevancy and expert testimony. See id. at 689. The court held that the psychologist's testimony had been properly excluded because it was irrelevant in that it failed to address the defendant's capacity to form the requisite *mens rea* for the crime. Id. at 691-92. Significantly, the basis for exclusion was *not* that the expert was a psychologist, rather than a psychiatrist. See generally id.

Thus, we believe that Hall mandates that we analyze the trial court's admission of expert testimony in the case at bar under the Rules of Evidence. The trial court found that the testimony could be admitted, provided that the state laid the proper foundation as a predicate to the psychologist's opinion. Further, the court ruled that the expert's status as a psychologist, as opposed to a psychiatrist, was a fact the jury could consider in weighing the evidence but was not a *per se* bar

to admission. By admitting the testimony, the court implicitly found that it would substantially assist the jury in determining the issue of diminished capacity.[2] See Tenn. R. Evid. 702. Upon review, we cannot say that the trial court abused its discretion. See State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997) (abuse of discretion standard for evidentiary rulings). The defense evidence, including the testimony of the defense psychiatrist and neuropsychologist, placed the issue of diminished capacity before the jury. The state's psychologist examined the defendant and offered opinions that were at odds with those offered by the defense experts. The state's contrary expert evidence would certainly substantially assist the jury in determining whether to accept the defendant's claim of diminished capacity. There was no error.

### III

The defendant's next complaint is of the trial court's admission of photographs of the victim because they were gruesome, appealed to the jury's emotions, and were irrelevant to any facts in issue.

In determining whether photographs should be admitted, the trial court must determine, first, whether the photograph is relevant. State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978); Tenn. R. Evid. 401. Photographs are not necessarily rendered inadmissible because they are cumulative of other evidence or because descriptive words could be used. Collins v. State, 506 S.W.2d 179, 185 (Tenn. Crim. App. 1973); see also State v. Terrence L. Davis, No. 02C01-9511-CR-00343 (Tenn. Crim. App., Jackson, June 2, 1997), perm. app. denied (Tenn. 1998). Photographs must be relevant to prove some part of the prosecution's case and must not be admitted solely to inflame the jury and prejudice them against the defendant. Banks, 564 S.W.2d at 951; see Tenn. R. Evid. 403 (relevant evidence may be admitted if its probative value is not "substantially outweighed by the danger of unfair prejudice"). Prejudice becomes unfair when the primary purpose of the evidence at issue is to elicit emotions of "bias, sympathy, hatred, contempt, retribution, or horror." M. Graham, Handbook of Federal Evidence 182-83 (2d ed. 1986). On appeal, a trial court's decision to admit a photographic exhibit is reviewable for abuse of discretion. Banks, 564 S.W.2d at 949.

In the present case, there are several photographs of the scene of the crime. In four of them, the victim's body, covered with a sheet, can be seen. One additional photograph depicts the victim's uncovered body in the location where he was felled. He is lying in a pool of blood.

Upon review, it is apparent that these photographs are relevant evidence to assist the jury in understanding the scene of the crime and the events which transpired. Moreover, these photographs speak to the issue with greater clarity than the not-to-scale diagram that was also offered as evidence. The photograph of the victim in which he is not covered by the sheet is relevant to

---

[2] The defendant's motion *in limine* to exclude this evidence addressed only the alleged bar of Hall to the admissibility of a psychologist's testimony. The defendant did not specifically challenge the admissibility of the evidence under the standard set forth in Tennessee Rule of Evidence 702.

show both his location when he was felled and the position in which he was lying when the defendant stood over him and shot him an additional time. Although these photographs are unpleasant in that they depict the scene and victim of a murder, they are no more so than other photographs of this nature. Moreover, they are not gruesome or inflammatory. Their probative value to the issues is not substantially outweighed by the danger of unfair prejudice from their admission. See Tenn. R. Evid. 403; Banks, 564 S.W.2d at 951. The trial court acted within its discretion in admitting these photographs.

## IV

The defendant's next issue is whether the trial court erred in failing to admonish the prosecutor for remarks made during closing argument. Closing arguments of the parties are not included in the record on appeal. We are unable to pass upon an issue which is not supported by an adequate record of what transpired in the court below. See Tenn R. App. P. 24(b) ("[T]he appellant shall have prepared a transcript of such part of the evidence or proceedings as is necessary to convey a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal."). This issue is waived. See State v. Oody, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991).

Additionally, the defendant has included no citation to authority in his argument. The issue is waived on this basis, as well. See Tenn. R. App. P. 27(a)(7); Tenn. R. Ct. Crim. App. 10(b).

## V

In his fifth issue, the defendant claims that the trial court improperly ruled that evidence of the identity of the individual who assisted the defendant in exchanging vehicles during his flight was relevant and admissible. In his brief, the defendant makes a two-sentence argument and generally asserts that the evidence was not material to any of the elements of the offense. He has failed to include citation to the record or relevant authority. This issue is waived. See Tenn. R. App. P. 27(a)(7); Tenn. R. Ct. Crim. App. 10(b).

However, we perceive no error. Evidence of the defendant's flight and attempts to evade arrest, when considered with other facts and circumstances, may lead to an inference of guilt. See, e.g., State v. Zagorski, 701 S.W.2d 808, 813 (Tenn. 1985). Flight may show "consciousness of guilt." Buckingham v. State, 540 S.W.2d 660, 665 (Tenn. Crim. App. 1976).

Thus, evidence about the defendant's flight and its surrounding circumstances was relevant to the question of the defendant's guilt of the crime of first degree murder. The trial court acted within its discretion in ruling that this evidence was admissible.

## VI

In a related issue, the defendant argues that the trial court expressed belief in the defendant's guilt by instructing the defendant to reveal the identity of the individual who assisted in his flight.

We agree with the defendant that the trial court must take great care to indicate no opinion of the defendant's guilt before the jury. See Veal v. State, 196 S.W.2d 443, 268 S.W.2d 345 (1954). However, upon review of the relevant portion of the transcript, we fail to see any indication of the trial court's opinion of the defendant's guilt or innocence. The defendant has not offered any precise identification of which statements of the trial court he finds objectionable, nor has he explained how any such remarks indicated the trial court's opinion that the defendant was guilty of the crime. We perceive no error.

## VII

Finally, the defendant argues that double jeopardy barred the state from retrying him on the offense of first degree premeditated murder because the jury at his first trial determined that he was not guilty of that offense but was unable to agree on his guilt of the lesser offenses.

The record reflects that during deliberations at the defendant's first trial, the jury returned to the courtroom to inquire about the maximum and minimum sentences for each offense.[3] The trial court instructed the jurors that sentencing considerations were irrelevant to their deliberations. The jury retired and later returned, this time reporting that it had reached a verdict on Count Two (attempted first degree murder of the victim's son) but not Count One (first degree murder of the victim). The court gave a further instruction, and the jury retired. When the jury returned to the courtroom again, the foreman reported that further deliberations would not yield a verdict on Count One because some of the jurors were unwilling to change their minds. After the foreman's report, the court polled six additional jurors, and each indicated agreement with the foreman's assessment that no verdict could be reached. *Sua sponte*, the court then polled the jury on its verdict on Count Two, accepted the verdict on Count Two, and declared a mistrial on Count One.

The following colloquy then took place:

---

[3]The defendant claims in his brief that because the jury inquired about the sentence ranges for second degree murder and voluntary manslaughter, it had necessarily "first acquitted Mr. Pierce of first degree murder and then moved to the lesser included offense." However, the record does not reflect that the jury asked about the sentence ranges for second degree murder and voluntary manslaughter specifically. Rather, the jury's foreperson inquired, "Can we ask you what the minimums and maximums are for each defense [sic]?" Contrary to the defendant's assertion, we think it is entirely possible that the jury desired to consider sentencing information so that it could choose a verdict of guilt of the crime which corresponded with the sentence the jury felt was appropriate for the defendant's actions, even though it had been instructed that sentencing considerations were irrelevant to its deliberations.

-9-

MR. LEONARD [Defense Counsel]:    Your Honor please, might I ask -- and I do not have my file as it relates to a special verdict form, as it relates to polling the jury as to whether they reached a decision on count one, murder first --

THE COURT:    They have not.

MR. LEONARD:    Okay, sir.

[WHEREUPON, the jury was dismissed.]

THE COURT:    You wouldn't think I would miss something like that, would you?

MR. LEONARD:    Your Honor please, on behalf of my client, I've got to make sure.

THE COURT:    Well, you may assume that I don't miss something quite that simple.

On the special verdict form from the first trial, "not guilty" is circled on Count Two for attempted first degree murder and the lesser-included offenses of attempted second degree murder and attempted voluntary manslaughter.  Neither "not guilty" nor "guilty" are circled on Count One for the offense of first degree murder nor for the lesser-included offenses of second degree murder or voluntary manslaughter.  The special verdict form is signed by the foreman.

Sometime after the jury was dismissed, defense counsel became aware of a conversation between a T.B.I. agent and the jury foreman which resulted in defense counsel obtaining several affidavits[4] attesting that the jury unanimously found the defendant not guilty of first degree murder but was unable to reach a verdict on a lesser-included offense.  The affiants claimed that the jury was unsure whether it should mark "not guilty" on the special verdict form.

The defendant argues that double jeopardy barred his retrial on the offense of first degree murder.[5] The state and federal constitutions both provide that no person shall, for the same offense, be twice put in jeopardy of life or limb. U.S. Const. amend. V; Tenn. Const. art. I, § 10.  Our

_____

[4]It is not clear from the defendant's brief whether he claims he obtained affidavits from ten jurors and the T.B.I agent or the jury foreperson and ten additional jurors.  The record contains nine affidavits of jurors, none of which were the foreman, and no affidavit of a T.B.I. agent.  The substantive content of the nine affidavits is identical.

[5]As a preliminary matter, we dismiss the defendant's claim that he requested that the jury be polled and that the court erred by failing to conduct the poll.  The record does not bear out this assertion.  The court polled the jury on Count Two although neither the defense nor the state requested it.  Defense counsel then inquired whether the jury made any findings on the offense and lesser-included offenses encompassed in Count One.  The court responded that the jury had not; defense counsel accepted this answer, and the jury was dismissed without objection.

-10-

supreme court has held that double jeopardy protects a defendant from (1) reprosecution for the same crime after an acquittal, (2) reprosecution for the same crime after a conviction, and (3) multiple punishments for the same offense. State v. Denton, 938 S.W.2d 373, 378 (Tenn. 1996); see also North Carolina v. Pearce, 395 U.S. 711, 717, 89 S. Ct. 2072, 2076 (1969), overruled on other grounds, Alabama v. Smith, 490 U.S. 794, 109 S. Ct. 2201 (1989). Double jeopardy is not a bar to a subsequent trial where a mistrial has been occasioned by "manifest necessity," such as where the jury has been unable to reach a verdict. See, e.g., State v. Mounce, 859 S.W.2d 319, 321-22 (Tenn. 1993).

In pertinent part, Tennessee Rule of Evidence 606(b) prohibits a juror from testifying, including by affidavit, about "any matter or statement occurring during the course of the jury's deliberations" with certain exceptions that are not relevant here. The affidavits offered by defense counsel in support of the double jeopardy claim fall squarely within the class of evidence that is inadmissible under Rule 606(b). Without competent evidence, the defendant's double jeopardy claim must fail.

Additionally, even if the affidavits were admissible, judicial consideration of them would be of no avail to the defendant. The jury foreperson's oral report that the jury was deadlocked and the special verdict form reflecting no verdict on Count One plainly establish that the jury was deadlocked. The law of this state is well-settled that after a jury has been discharged from court, it may not be reassembled to amend, correct or impeach its verdict. See, e.g., Clark v. State, 170 Tenn. 494, 500, 97 S.W.2d 644, 646 (1936); State v. Green, 995 S.W.2d 591, 606-614 (Tenn. Crim. App. 1998), perm. app. denied (Tenn. 1999). The sound rationale for this rule is that once the jury has been discharged, its members have been separated from the trial court and are subject to outside contacts; thus, further action involving the fate of the accused would be improper. See Green, 995 S.W.2d at 612-13.

In the present case, the gathering of affidavits of some of the jurors was, in practical effect, an attempt to reassemble the jury for purposes of impeaching the prior report of a deadlock on Count One. Obviously, by this point the jury was separated from the trial court and subject to outside contacts. Under our precedent, "reassembly" and "impeachment" were impermissible. As such, the prior report stands, and it constitutes "manifest necessity" for the trial court's grant of a mistrial. Because the grant of a mistrial in a case of manifest necessity does not implicate double jeopardy concerns, the defendant is not entitled to relief on this issue.

Finding no error requiring reversal, we affirm the judgment of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE