# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs May 18, 2011

## STATE OF TENNESSEE v. ANTHONY EUGENE POOLE

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2008-D-4206      Cheryl Blackburn, Judge**

---

**No. M2010-01179-CCA-R3-CD - Filed March 9, 2012**

---

Defendant, Anthony Eugene Poole, was indicted by the Davidson County Grand Jury for aggravated assault. Defendant was convicted of the lesser included offense of assault and sentenced by the trial court to 11 months and 29 days to be suspended on probation. Defendant appeals his conviction and sentence and asserts that: 1) the evidence was insufficient to support his conviction; 2) the trial court erred by not instructing the jury as to the defenses of duress and necessity; 3) the statute of limitations barred his prosecution; 4) his sentence of intensive probation and imposition of a fine was improper; and 5) the trial court erred by ordering Defendant to pay restitution to the victim. Finding no error, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., J., joined. JUDGE J.C. MCLIN was originally on the panel to which this case was assigned. Judge McLin died September 3, 2011, and we acknowledge his faithful service to this Court.

Dawn Deaner, District Public Defender; Emma Tennent, Assistant Public Defender; Rodney Caldwell, Assistant Public Defender; and J. Michael Engle, Assistant Public Defender, Nashville, Tennessee, for the appellant, Anthony Eugene Poole.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Victor S. (Torry) Johnson, III, District Attorney General; and Jeff Burks, Assistant District Attorney General, for the appellee, the State of Tennessee.

**OPINION**

*Facts*

Les Weakley testified that on November 6, 2005, he was a security guard for Artist Protection Security Service, a business that he co-owned with his son Jerry Rogers and Brian Fulton. On that date, he provided security for The 615 Club on Woodland Street in Nashville. The rap group Three 6 Mafia was performing there. At approximately 1:30 a.m., Matt Johnson, another security guard, contacted Mr. Weakley by radio and notified him that "a well-dressed man in black [was] headed [his] way," and Mr. Johnson suggested that the man not be allowed entry into the club. Mr. Weakley identified that man as Defendant. When Defendant approached him, he explained that he was going to deny him entry to the club. Defendant "got kind of belligerent." The owner of the club, Robert Gaddy, saw Defendant and informed Mr. Weakley that Defendant was a cook at the club and that Mr. Gaddy would "take all responsibilities for [Defendant]." Mr. Weakley cautioned Mr. Gaddy that Defendant was a "security risk," but he allowed Defendant to enter the club at Mr. Gaddy's request.

Mr. Weakley testified that the "bull pen" was an area outside of the club where security guards escorted patrons who had to be taken out of the club for "rowdiness." At approximately 1:40 a.m., Mr. Weakley saw Defendant using his cell phone in the "bull pen." Mr. Weakley told Defendant to leave that area and told him that it was "not a social area." Mr. Weakley testified that Defendant became "belligerent" again and was "carrying on and carrying on," calling him and another security guard "MFs" and telling them that they had "no right" to tell him what to do. Mr. Weakley told Defendant to leave, and Defendant refused. Mr. Weakley testified that Defendant "dropped back on his strong foot like a fighting stance." Mr. Weakley then pulled out his pepper spray. Defendant came towards him, and Mr. Weakley sprayed him. Defendant "charged the door" to go back into the club, and Mr. Weakley grabbed him and tried to lead him back out. Defendant punched Mr. Weakley in his left eye and "knocked [him] off [his] feet." Mr. Weakley testified that he was "bleeding quite bad[ly]." Mr. Weakley asked Defendant to speak to him, and Defendant refused and "disappeared back in the club." Another security guard, Christina Harding, drove Mr. Weakley to the hospital, where he was x-rayed and scanned and received stitches around his eye. Mr. Weakley's nose was also broken. That same night, Mr. Weakley filed a police report and took out a warrant against Defendant. Mr. Weakley underwent five surgeries for his injuries.

On cross-examination, Mr. Weakley testified that Defendant was searched for weapons and drugs prior to entering the club. Mr. Weakley was carrying a baton and a handgun in addition to the pepper spray. Mr. Weakley also testified that Defendant did not

make any physical contact with him before Mr. Weakley sprayed Defendant with pepper spray.

Michael Merritt, a security guard for Artist Protection Security Services at the time of the incident, testified that he was working in the parking area, which was full to capacity, when a car drove into the parking area, and he told the driver to park across the street. Defendant got out of the vehicle and, using "foul language," refused to park across the street. Mr. Merritt again told him to park across the street. Defendant got back inside the car and backed up. Mr. Merritt walked "forward, and [Defendant] started driving towards [him]." Defendant turned into a "spot" and got out. As Defendant walked away, he told Mr. Merritt "you better not touch that car or I'm going to kill you." Mr. Merritt radioed the other security guards inside the club and gave a description of Defendant to them. Mr. Merritt did not see the altercation between Defendant and Mr. Weakley, and he did not see Defendant again. He later saw Mr. Weakley leaving the club with a bloody eye.

Jay Rogers was also employed as a security guard on the morning of the incident. He was working as a supervisor in the bull pen. He testified that at approximately 1:35 or 1:45 a.m., Officer Matt Johnson radioed him and told him that "a very nice dressed gentleman . . . had threatened Officer Merritt with a vehicle and that he had went [sic] ahead and let him in but that he would not let him in the facility if he were [them]." Mr. Rogers was keeping a count of the number of people who entered and exited the club. He testified that when Mr. Weakley asked Defendant to leave the premises, Defendant "became extremely violent and basically started cussing [Weakley and Gammon] out." Mr. Rogers advised Mr. Gaddy that Defendant was belligerent and threatening, and Mr. Gaddy explained that Defendant was an employee of the club and requested that he be allowed to go inside. Mr. Rogers testified that approximately five minutes later, Defendant "came back outside and . . . became extremely verbally abusive" towards Mr. Weakley. Mr. Rogers testified that his back was facing Defendant and Mr. Weakley and that he did not see the altercation. Mr. Rogers then "heard the release of aerosol" and turned to see what happened. The wind shifted and Mr. Rogers was sprayed with pepper spray. He was "immediately blinded." Mr. Rogers wiped his eyes with a towel and saw Mr. Weakley on the ground. Mr. Weakley was "bleeding profusely." After Mr. Weakley was taken to the hospital, Mr. Rogers directed the other security officers to do a "room by room search" of the club, but they did not locate Defendant. The only room that they were not allowed to search was Mr. Gaddy's office.

David Gammon was also employed as a security guard at the 615 Club on the night of the incident. Mr. Gammon checked patrons' identifications and searched them before entering the club. He saw Mr. Weakley deny Defendant admittance to the club. Mr. Gammon testified that he knew Defendant from having seen him at other events in other venues. After Defendant struck Mr. Weakley, Mr. Gammon followed Defendant inside. Mr.

Gammon testified that Defendant was in the restroom cleaning his face off "evidently from getting sprayed from mace." Defendant told Mr. Gammon that Mr. Weakley "sprayed [him] for no reason."

Dr. Mark Melson, an ophthalmologist who specializes in oculoplastic and reconstructive surgery, testified that Mr. Weakley's left eye socket and his nose were fractured, and he had a laceration on his left eyelid. Dr. Melson testified that Mr. Weakley's injuries were painful and that the surgery to repair his injuries was "complex."

Defendant testified that he was employed as a cook at the 615 Club. He arrived for work at approximately 10:00 a.m. on the day prior to the incident. He left and returned throughout the day and went back to the nightclub for the final time that night in the early morning hours on the date of the incident. He rode with his cousin Patrick Sweat. Defendant testified that he got out of his cousin's vehicle and got into a car driven by a young lady. When they pulled into the parking lot, he tried to get the security guard's attention to tell him that he worked there and that they were parking in Defendant's parking space. The security guard "ignored [him,] telling [him] to get off the property [and] back up." Defendant told the young lady to "go ahead and park your car," and Defendant proceeded to go inside the nightclub. Defendant testified that he did not threaten the security guard in the parking lot. He testified that he was stopped by Mr. Weakley when he tried to enter the nightclub. Mr. Weakley told him, "[Y]ou're not coming in." Defendant told Mr. Weakley that he worked there and used his cell phone to call Mr. Gaddy. Mr. Gaddy came to the area outside the entrance and told Mr. Weakley that Defendant could enter and that he would "take full responsibility" for him.

After Defendant was allowed to enter the nightclub, he went to the kitchen. Three or four minutes later, the young lady let Defendant know that she "was coming up to the gate" outside. While Defendant was talking to her on his cell phone, he went outside the club to look for her. Mr. Weakley told Defendant to "get off your phone and go back into the club." Defendant said, "I'm a grown man, you can't tell me what to do." Defendant told Mr. Weakley "to get out of [his] face." Defendant refused to leave and told Mr. Weakley that he was going back inside to find Mr. Gaddy. Mr. Weakley grabbed Defendant, and Defendant "jerked [his] arm away" and told him not to "put [his] hands on [him]." Mr. Weakley grabbed his "mace" and stood in front of Defendant and said, "I'll give you 3 seconds to leave the premises." Mr. Weakley began to count, and Defendant refused to leave. Mr. Weakley told Defendant to get off his phone, and Defendant said, "[Y]ou can't tell me what to do." Defendant admitted that he "might have said a few cuss words [like], 'get the hell out of my face' . . . ." Defendant testified that he was "about to go in" the nightclub, and Mr. Weakley sprayed him directly in his eyes. Defendant "thought [his] eyes were being liquidated." Defendant went back inside the nightclub, and Mr. Weakley grabbed his arm.

-4-

Defendant jerked away again. Mr. Weakley grabbed Defendant from behind and Defendant "swung blindly at him." Defendant then went to the restroom to clean his eyes. Defendant testified that he was scared and intimidated by Mr. Weakley. When he left the restroom, Defendant went to the kitchen to get ice. He testified that he stayed at the nightclub for another one or two hours after the incident. On cross-examination, Defendant testified that he was "furious" during the encounter with Mr. Weakley.

*Sentencing Hearing*

A sentencing hearing was held on March 26, 2010. Mr. Weakley testified at the sentencing hearing that he missed two weeks of work, for which he would have been paid $740.00 per week, as a result of the injuries to his eye. He testified that he "eventually ended up having to close the security guard business because the eye problem will never be right again." He testified that his injuries caused him to have double vision. Mr. Weakley did not incur any out-of-pocket expenses for his surgeries or hospitalization. Mr. Weakley also filed a civil lawsuit, which resulted in a default judgment against Defendant, but Mr. Weakley was unsure of the amount of damages awarded.

Defendant testified that he was unemployed but that he expected to begin employment with Smith Ventures on April 1, 2010. He testified that he would obtain an insurance license for that job. He testified that if he submitted to a drug test, the result would be negative. Defendant testified that he was convicted of misdemeanor assault in 2001 and that he had never been convicted of a felony.

*Analysis*

I.      Sufficiency of the Evidence

Defendant contends that the evidence at trial was insufficient to establish the elements of assault. Specifically, Defendant "does not dispute that he was involved in an altercation" with the victim, but he asserts that he acted in self-defense.

When reviewing the sufficiency of the evidence on appeal, the standard is "whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781 (1979). Questions concerning the credibility of the witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, not this Court. *State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). This Court may not reweigh or reevaluate the evidence but should presume that the jury has resolved all conflicts in the

testimony and drawn all reasonable inferences from the evidence in favor of the State. *State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978).

A person commits an assault who "intentionally, knowingly or recklessly causes bodily injury to another[.]" Tenn. Crim. App. § 39-13-101(a)(1). Following the standard of review set out above, we conclude that the elements of assault were established in the instant case. Defendant admitted that he struck Mr. Weakley when he "swung blindly" at him. Mr. Weakley testified that Defendant punched him in his eye so hard that it "knocked [him] off [his] feet." Mr. Weakley sustained injuries as a result of the hit.

Turning to Defendant's contention that he acted in self-defense, we must conclude that there was sufficient evidence for the jury to find beyond a reasonable doubt that the defendant was not acting in self-defense. Tennessee's self-defense statute, as it existed at the time of the offense, provides as follows:

> A person is justified in threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force. The person must have a reasonable belief that there is an imminent danger of death or serious bodily injury. The danger creating the belief of imminent death or serious bodily injury must be real, or honestly believed to be real at the time, and must be founded upon reasonable grounds. There is no duty to retreat before a person threatens or uses force.

Tenn. Code Ann. § 39-11-611(a)(2003).

When a defendant relies upon a theory of self-defense, the State bears the burden of proving that the defendant did not act in self-defense. *State v. Sims*, 45 S.W.3d 1, 10 (Tenn. 2001). Further, it is well-settled that whether an individual acted in self-defense is a factual determination to be made by the jury as the sole trier of fact. *State v. Ivy*, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993). It is within a jury's prerogative to reject a claim of self-defense. *State v. Goode*, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997).

When viewed in the light most favorable to the State, the evidence establishes that the victim, a security guard, repeatedly asked Defendant to go back inside the nightclub or leave the area. Defendant refused to comply. Mr. Weakley testified that Defendant was "belligerent" and that he "dropped back . . . [into] a fighting stance." Mr. Weakley pulled out his pepper spray. Defendant advanced towards him, and Mr. Weakley sprayed Defendant with the pepper spray. Defendant tried to go back inside the nightclub, and Mr. Weakley

-6-

grabbed him. Defendant then punched Mr. Weakley in his eye. Although Defendant testified that he struck Mr. Weakley to defend himself against Mr. Weakley's aggression, the jury accredited Mr. Weakley's testimony over Defendant's. We conclude that the evidence is sufficient to support the jury's verdict that Defendant did not act in self-defense. Defendant is not entitled to relief on this issue.

## II.    Jury Instructions

Defendant contends that the trial court erred by refusing to instruct the jury on the defenses of duress and necessity. The record shows that the trial court instructed the jury at Defendant's request on self-defense as follows:

> Included in the defendant[']s plea of not guilty is his plea of self[-]defense. As a general rule, when a person is assaulted by the use of force in such a way as to create in his mind a reasonable belief that he is in imminent and actual danger of serious bodily injury, he will be justified in using force to defend himself even to the extent of killing another human being. The use of force can only be to the degree reasonably believed to be immediately necessary to protect against the other's use of unlawful force. The danger creating the belief of imminent serious bodily injury must be real, or honestly believed to be real at the time, and must be founded upon reasonable grounds. A person may have been mistaken, based on his perception of the circumstances, as to the extent of actual danger, but if he acts in self-defense from honest, even though mistaken, convictions as to the extent of danger he will not be held criminally liable for his action. In determining whether the defendant's use of force in defending himself was reasonable, you may consider not only his use of force but also all the facts and circumstances surrounding and leading up to it. Factors to consider in deciding whether there were reasonable grounds for the defendant to fear serious bodily injury from the alleged victim include but are not limited to any previous threats of the alleged victim made known to the defendant; the character of the alleged victim for violence, when known to the defendant; the animosity of the alleged victim for the defendant, as revealed to the defendant by previous acts and words of the alleged victim; and the manner in which the parties were armed and their relative strengths and sizes. If the evidence shows the defendant had fear of serious bodily injury and if the circumstances justify that belief as genuine and reasonable, then he would have had the right to use as much force as was apparently necessary in his own self-defense. If, on the other hand, you find that the defendant was not genuinely or reasonably fearful of serious bodily injury based on the

circumstances, or that he used force going beyond the real or apparent necessity for his own defense, then his use of force would not have been justified. There is no duty to retreat before a person uses force. The use of force against another is not justified if the defendant provoked the alleged victim's use or attempted use of unlawful force, unless the defendant abandoned the encounter or clearly communicated to the alleged victim the intent to do so, and the alleged victim nevertheless continued or attempted to use unlawful force against the defendant. If the alleged victim had become disarmed or helpless, or all danger to the defendant had disappeared, then the defendant's right to self-defense would not justify his further use of force.

. . . .

It appears from the record that Defendant also requested a jury charge on duress, but nowhere in the record, does it appear that Defendant requested a jury charge on necessity, and Defendant acknowledges in his brief that the record does not reflect such request.

A trial court has a duty to give a complete charge of the law applicable to the facts of the case. *State v. Davenport*, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998). When the trial court instructs fully and fairly, setting forth the applicable law, it is not error to refuse to give a special instruction requested by a party. *State v. Bohanan*, 745 S.W.2d 892, 897 (Tenn. Crim. App. 1987). The test for whether a special instruction must be given is whether "there is any evidence which reasonable minds could accept as to any such [defense] . . . ." *Johnson v. State*, 531 S.W.2d 558, 559 (Tenn. 1975).

The defense of duress is defined as follows:

Duress is a defense to prosecution where the person or a third person is threatened with harm which is present, imminent, impending and of such a nature to induce a well-grounded apprehension of death or serious bodily injury if the act is not done. The threatened harm must be continuous throughout the time the act is being committed, and must be one from which the person cannot withdraw in safety. Further, the desirability and urgency of avoiding the harm must clearly outweigh, according to ordinary standards of reasonableness, the harm sought to be prevented by the law proscribing the conduct.

Tenn. Code Ann. § 39-11-504. "There must be no reasonable means to escape the compulsion to commit the offense." *Davenport*, 973 S.W.2d at 288.

The State analogizes this case to the facts of *State v. Jason C. Polston*, No. W2003-02556-CCA-R3-CD, 2004 WL 1869984 (Tenn. Crim. App. at Jackson, filed Aug. 19, 2004), *no perm. app. filed*. In that case, the defendant alleged that the trial court should have charged the jury with duress because of testimony that the victim head-butted him prior to the assault. *Id*. at *14-15. This Court found that the trial court properly instructed the jury on self-defense instead, as the defendant had not suggested that the victim compelled the defendant to commit the offense through any continuous coercion. We agree with the State. There was no evidence here to suggest that Defendant was continuously coerced to commit the offense of assault.

Regarding the defense of necessity, Tennessee Code Annotated section 39-11-609 states that except as provided in §§ 39-11-611 to 39-11-621, conduct is justified if:

> (1) [t]he person reasonably believes the conduct is immediately necessary to avoid imminent harm; and
>
> (2) [t]he desirability and urgency of avoiding the harm clearly outweigh, according to ordinary standards of reasonableness, the harm sought to be prevented by the law proscribing the conduct.

Tenn. Code Ann. § 39-11-609. "The sentencing commission comments note that the statutory provision codifies the common law defense of necessity and excuses criminal conduct in those exceedingly rare situations where criminal activity is an objectively reasonable response to an extreme situation." *State v. Green*, 995 S.W.2d 591, 606 (Tenn. Crim. App. 1998). Necessity is generally used when the extreme situation is brought on by something other than a human act. *Davenport*, 973 S.W.2d at 287 (citing Neil P. Cohen et al., *Prevalence and Use of Criminal Defenses: A Preliminary Study*, 60 Tenn. L. Rev. 957, 966 (1993)). "[T]his court has rejected claims of error in a trial court's refusal to charge the defense of necessity in crimes of violence." *State v. Marcus A. Terry*, No. 02C01-9708-CR-00313, 1998 WL 775651, at *5 (Tenn. Crim. App. at Jackson, filed Nov. 6, 1998), *perm. app. denied* (Tenn., Apr. 26, 1999).

Defendant has not demonstrated that a non-human act prompted his assault on the victim. We conclude that the trial court's instruction on self-defense was the appropriate instruction in light of the testimony of Defendant and the victim. The evidence at trial did not support the defenses of duress and necessity. The jury instructions in this case fairly submitted the legal issues to the jury. Defendant is not entitled to relief on this issue.

III.     Statute of Limitations

Defendant next contends that the statute of limitations for assault expired prior to the State's commencement of prosecution. The State responds that Defendant has 1) failed to prepare an adequate record for our review of the issue, *see* Tenn. R. App. P. 24(b), and 2) the statute of limitations was nevertheless tolled by the issuance of the warrant in this case.

"When a party seeks appellate review there is a duty to prepare a record which conveys a fair, accurate and complete account of what transpired with respect to the issues forming the basis of the appeal." *State v. Ballard*, 855 S.W.2d 557, 560 (Tenn. 1993); *see also James David Alder v. State*, No. M2003-02767-CCA-R3-PC, 2004 WL 2984845, at * 6 (Tenn. Crim. App., at Nashville, Dec. 16, 2004), *no perm. app. filed*. In the absence of an adequate record, this Court must presume that the trial court's ruling was supported by the evidence. *State v. Roberts*, 755 S.W.2d 833, 836 (Tenn. Crim. App. 1988).

Our review of the record shows that the offense occurred on November 6, 2005. In his brief Defendant "concurs that the victim obtained the warrant [against Defendant] on November 18, 2005." Defendant alleges that he was served with the warrant on April 21, 2008. However, the record on appeal does not include the warrant that issued against Defendant or any record of its service upon Defendant. A preliminary hearing was had on July 7, 2008. The technical record shows that an indictment charging Defendant with aggravated assault was filed on December 18, 2008. Following a jury trial, Defendant was convicted of the lesser included offense of misdemeanor assault on January 27, 2010.

Defendant filed a pretrial motion to dismiss the indictment alleging that his constitutional right to a speedy trial had been violated. The warrant was not made an exhibit to the hearing on Defendant's motion. Defendant testified at the hearing that he been residing at the same address since the date of the incident, but that he also maintained another address. Defendant testified that he was stopped by police in March, 2006, and was issued a citation for driving without a driver's license, which he paid. However, Defendant was not made aware of the arrest warrant in this case until April, 2008, when his brother, who is a Metro police officer, told him that he had an outstanding warrant. Defendant then turned himself in to police.

In its order denying Defendant's motion, the trial court found that Defendant was not prejudiced by the delay in prosecution. We note that in its order, the trial court stated that "[t]he arrest warrant for Defendant was issued on April 21, 2008[,]" which is the date that Defendant alleges he was served with the warrant. However, at a hearing on April 23, 2010, the trial court stated that the arrest warrant was issued on November 18, 2005. Nevertheless, the warrant is not contained in the record before us.

We begin by stating that Defendant is correct in his assertion that the applicable

statute of limitations in this case is twelve months from the date of the offense. Defendant was charged with the Class C felony offense of aggravated assault. Tenn. Code Ann. § 39-13-102(e)(1). However, Defendant was convicted of the lesser included offense of simple assault, a Class A misdemeanor. Tenn. Code Ann. § 39-13-101(b)(1). Accordingly, the prosecution in this case had to have commenced prior to November 6, 2006. *See* Tenn. Code Ann. § 40-2-102.

According to Tennessee Code Annotated section 40-2-104, a prosecution is commenced by the following:

> [F]inding an indictment or presentment, the issuing of a warrant, the issuing of a juvenile petition alleging a delinquent act, binding over the offender, by the filing of an information as provided for in chapter 3 of this title, or by making an appearance in person or through counsel in general sessions or any municipal court for the purpose of continuing the matter or any other appearance in either court for any purpose involving the offense.

Tenn. Code Ann. § 40-2-104. This section "provides for the commencement of a prosecution by several methods, 'all deemed to provide the defendant with sufficient notice of the crime.'" *State v. Ferrante*, 269 S.W.3d 908, 914 (Tenn. 2008) (quoting *State v. Tait*, 114 S.W.3d 518, 522 (Tenn. 2003)).

On appeal, Defendant argues that despite the issuance of a warrant only twelve days after the offense, Defendant was not served with the warrant until the relevant statute of limitations period had expired. The State cites *Allen v. State*, 505 S.W.2d 715, 717 (Tenn. 1974), in which our supreme court held that "the statute of limitation is tolled by the issuance of the warrant and not by service of the warrant on the defendant." We agree with the State. Because the warrant is not contained in the record before us, we must presume that the trial court was correct. At the April 23, 2010 hearing, the trial court found that the warrant was issued on November 18, 2005. Defendant concedes in his brief that the warrant was issued on that date. Therefore, because the warrant was issued within the applicable statute of limitations period, Defendant is not entitled to relief on this issue.

IV.    Sentencing

Defendant asserts that the trial court erred by sentencing him to intensive probation, by imposing a $1,000 fine, and by ordering Defendant to pay restitution to the victim.

At the conclusion of the sentencing hearing, the trial court found that Defendant had "a previous history of criminal convictions or behavior in addition to those necessary to

establish the appropriate range" and that "the [victim's] personal injuries were pretty significant in this case." The trial court did not find any applicable mitigating factors. The trial court sentenced Defendant to 11 months and 29 days to be suspended and placed Defendant on intensive probation, imposing the following conditions on Defendant's probation: a curfew; weekly reporting; anger management counseling; random drug screens; public service work; and that Defendant maintain full-time employment. The trial court imposed a fine of $1,000 and ordered Defendant to pay the victim $1,480 in restitution for the victim's lost wages.

Defendant argues that the trial court's imposition of a $1,000 fine and order of intensive probation was improper. When there is a challenge to the manner of service of a sentence, it is the duty of this Court to conduct a *de novo* review of the record with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d). This presumption is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances. *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). The burden of showing that the sentence is improper is upon the appellant. *Id*. In the event the record fails to demonstrate the required consideration by the trial court, review of the sentence is purely *de novo*. *Id*. If appellate review, however, reflects that the trial court properly considered all relevant factors and its findings of fact are adequately supported by the record, this Court must affirm the sentence, "even if we would have preferred a different result." *State v. Fletcher*, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

Misdemeanor sentencing is controlled by Tennessee Code Annotated section 40-35-302, which provides, in part, that the trial court shall impose a specific sentence that is consistent with the purposes and principles of the 1989 Sentencing Reform Act. *See* Tenn. Code Ann. § 40-35-302(b). Although the Sentencing Reform Act typically treats misdemeanants and felons the same, misdemeanants are not given the presumption of a minimum sentence. *See State v. Seaton*, 914 S.W.2d 129, 133 (Tenn. Crim. App. 1995). A separate sentencing hearing is not required in misdemeanor sentencing, but the trial court must "allow the parties a reasonable opportunity to be heard on the question of the length of any sentence and the manner in which the sentence is to be served." Tenn. Code Ann. § 40-35-302(a). A misdemeanor sentence, unlike a felony sentence, has no sentence range. *State v. Baker*, 966 S.W.2d 429, 434 (Tenn. Crim. App. 1997).

The trial court is allowed greater flexibility in setting misdemeanor sentences than felony sentences. *State v. Johnson*, 15 S.W.3d 515, 518 (Tenn. Crim. App. 1999). The trial court, however, must impose a specific sentence for a misdemeanor conviction consistent with the purposes and principles of the 1989 Criminal Sentencing Reform Act. Tenn. Code Ann. § 40-35-302(d); *State v. Palmer*, 902 S.W.2d 391, 394 (Tenn. 1995). The trial court

should consider enhancement and mitigating factors in making its sentencing determinations; however, unlike the felony sentencing statute, which requires the trial court to place its findings on the record, the misdemeanor sentencing statute "merely requires a trial judge to consider enhancement and mitigating factors when calculating the percentage of a misdemeanor sentence to be served in confinement." *State v. Troutman*, 979 S.W.2d 271, 274 (Tenn. 1998). When a defendant challenges a misdemeanor sentence, this Court conducts a *de novo* review with a presumption that the trial court's determinations are correct. Id. § 40-35-401(d).

In this case, the trial court noted that Defendant had a previous conviction for assault, which Defendant conceded at the sentencing hearing. In ordering Defendant to complete anger management counseling, the trial court noted that Defendant's demeanor in court indicated that he had "significant issues about anger." The trial court also noted the significant nature of the victim's injuries. Finally, taking into consideration Defendant's then inability to pay a fine, the trial court reduced the jury imposed fine of $2,500 to $1,000. We conclude that the trial court's imposition of the fine and ordering Defendant to serve his sentence on intensive probation was not error.

Next, Defendant asserts that the amount of restitution ordered is unreasonable in light of Defendant's unemployment and financial resources at the time of the sentencing hearing.

When a defendant challenges the validity and amount of restitution, this Court must normally conduct a *de novo* review of both the amount of restitution ordered and the method by which it was determined. *State v. Johnson*, 968 S.W.2d 883, 884 (Tenn. Crim. App. 1997) (citing Tenn. Code Ann. § 40–35–401(d)). The trial court is entitled to a presumption of correctness. *Johnson*, 968 S.W.2d at 884 (citing Tenn. Code Ann. § 40–35–401(d)).

Tennessee Code Annotated section 40-35-304, which governs restitution in conjunction with probation, provides in pertinent part as follows:

> (a) A sentencing court may direct a defendant to make restitution to the victim of the offense as a condition of probation.

> (b) Whenever the court believes that restitution may be proper or the victim of the offense or the district attorney general requests, the court shall order the presentence service officer to include in the presentence report documentation regarding the nature and amount of the victim's pecuniary loss.

> . . . .

-13-

(d) In determining the amount and method of payment or other restitution, the court shall consider the financial resources and future ability of the defendant to pay or perform.

Tenn. Code Ann. § 40-35-304.

We conclude that the trial court properly considered the victim's losses and Defendant's ability to pay in ordering that Defendant pay $1,480 in restitution to the victim. Mr. Weakley testified that he was unable to work for two weeks as a result of his injuries. He testified that his weekly pay at the time of the incident was $740. Although Defendant was unemployed at the time of the sentencing hearing, he testified that he anticipated that he would begin employment shortly after the hearing. Defendant is not entitled to relief on this issue.

## CONCLUSION

The judgment of the trial court is affirmed.

_____
THOMAS T. WOODALL, JUDGE